2003 OK 112

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Robert F. GROSHON, Jr., Respondent.**

**No. SCBD4663.**

Supreme Court of Oklahoma.

Dec. 16, 2003.

Loraine Dillinder Farabow, Assistant General Counsel, Oklahoma Bar Association, Oklahoma City, OK, for Complainant.

Robert F. Groshon, Jr., *pro se*, Oklahoma City, OK, for Respondent.

OPALA, V.C.J.

¶1 In this disciplinary proceeding against a lawyer, the issues to be decided are: (1) Does the record [1] submitted for our examination provide sufficient evidence for a meaningful *de novo* consideration of the complaint and of its disposition? and (2) Is a public censure and the payment of costs associated with this proceeding an appropriate disciplinary sanction for respondent's breach of professional discipline? We answer both questions in the affirmative.

## I.

### INTRODUCTION TO THE RECORD

¶2 The Oklahoma Bar Association (OBA) charged Robert F. Groshon, Jr. (Groshon or respondent), a licensed Oklahoma lawyer, with three counts of professional misconduct by filing a formal complaint in accordance with the provisions of Rule 6, Rules Governing Disciplinary Proceedings (RGDP).[2] The complaint alleges in three counts Groshon's violation of the RGDP and the Oklahoma Rules of Professional Conduct (ORPC)[3]. The Bar rests its counts on ORPC Rules 1.1,[4] 1.7(b)(2),[5] 1.8(b),[6] 2.1,[7] 8.4(a) and (d),[8] and

---

1. The record consists of the PRT hearing's transcript, the PRT report, the parties' stipulations of fact and conclusions of law, the mitigating factors to be considered in conjunction with the charges, the exhibits offered by the parties and a joint brief of the parties in support of the PRT report and recommendation.

2. The provisions of RGDP Rule 6.1, 5 O.S.2001, Ch. 1, App. 1–A, state in pertinent part:
   "The proceeding shall be initiated by a formal complaint prepared by the General Counsel, approved by the Commission, signed by the chairman or vice-chairman of the Commission, and filed with the Chief Justice of the Supreme Court. * * * "

3. 5 O.S.2001 Ch. 1, App. 3–A.

4. The terms of ORPC Rule 1.1 provide: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation."

5. The provisions of ORPC Rule 1.7(b)(2) state:

   "(b) A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless (2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include explanation of the implications of the common representation and the advantages and risks involved."

6. The terms of ORPC Rule 1.8(b) provide:
   "b) A lawyer shall not use information relating to representation of a client to the disadvantage of the client unless the client consents after consultation, except as permitted or required by Rule 1.6 or Rule 3.3."

7. The provisions of ORPC Rule 2.1 state:
   "In representing a client, a lawyer shall exercise independent professional judgment and render candid advice. In rendering advice, a lawyer may refer not only to law but to other considerations such as moral, economic, social and political factors, that may be relevant to the client's situation."

8. The pertinent provisions of ORPC Rule 8.4(a) provide:

RGDP Rule 1.3;[9] it withdraws its reliance on ORPC Rule 8.4(b).[10]

¶ 3 The Professional Responsibility Tribunal (PRT) held a hearing on 24 June 2003 to consider the charges. The trial panel recognized for the record the parties' admitted fact stipulations, conclusions of law and agreed disciplinary recommendation. Respondent concedes (by stipulation)that his conduct violates RGDP Rules 1.3 and ORPC Rules 1.1, 1.7(b)(2), 1.8(b), 2.1 and 8.4(a) and (d).

¶ 4 Upon completion of the hearing and consideration of the stipulations and testimony on file, the trial panel issued its report (which incorporates the parties' stipulations). It recommends that the respondent (1) receive a public reprimand and (2) pay the costs of this proceeding.

"It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; * * * "
Although the complaint neglected to include ORPC Rule 8.4(d), the Assistant General Counsel for the OBA stated during the bar hearing that this was inadvertent and should be included in the complaint. (Transcript p. 5.) The terms of ORPC Rule 8.4(d) state:
"It is professional misconduct for a lawyer to:
(d) engage in conduct that is prejudicial to the administration of justice; * * * "

**9.** The terms of RGDP Rule 1.3 provide:

"The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline."

**10.** The terms of ORPC Rule 8.4(b) provide:

"It is professional misconduct for a lawyer to:
(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; * * * "

## II.

## THE RECORD BEFORE THE COURT PROVIDES SUFFICIENT EVIDENCE FOR A MEANINGFUL *DE NOVO* CONSIDERATION OF ALL FACTS RELEVANT TO THIS PROCEEDING

[1–4] ¶ 5 In a bar disciplinary proceeding this court functions as an adjudicative licensing authority that exercises exclusive original jurisdiction.[11] Its authority rests on the constitutionally vested, nondelegable power to regulate the practice of law (which includes the ethics, licensure, and discipline of the State's legal practitioners).[12] In deciding whether discipline is warranted and what sanction, if any, is to be imposed for the misconduct charged, this court conducts a nondeferential, full-scale *de novo* examination of all relevant facts,[13] in which the findings, conclusions and recommendations of the trial

**11.** *State ex rel. Oklahoma Bar Ass'n v. Schraeder,* 2002 OK 51, ¶ 5, 51 P.3d 570, 572; *State ex. rel. Oklahoma Bar Ass'n v. Cox,* 2002 OK 23, ¶ 5, 48 P.3d 780, 782; *State ex rel. Okla. Bar Ass'n v. Leigh,* 1996 OK 37, ¶ 11, 914 P.2d 661, 666; *State ex rel. Okla. Bar Ass'n v. Eakin,* 1995 OK 106, ¶ 8, 914 P.2d 644, 647; *State ex rel. Okla. Bar Ass'n v. Bolton,* 1994 OK 53, ¶ 15, 880 P.2d 339, 344; *State ex rel. Okla. Bar Ass'n v. Donnelly,* 1992 OK 164, ¶ 11, 848 P.2d 543, 545; *State ex rel. Okla. Bar Ass'n v. Raskin,* 1982 OK 39, ¶ 11, 642 P.2d 262, 265; *In re Integration of State Bar of Oklahoma,* 1939 OK 378, 95 P.2d 113, 115.

**12.** *Schraeder, supra* note 11, at ¶ 5 at 573; *Cox, supra* note 11, at ¶ 5 at 782; *Eakin, supra* note 11, at ¶ 8 at 648; *State ex rel. Okla. Bar Ass'n v. Downing,* 1990 OK 102, ¶ 12, 804 P.2d 1120, 1122–23; *Raskin, supra* note 11, at ¶ 11 at 265–66.

**13.** *Schraeder, supra* note 11, at ¶ 5 at 573; *Cox, supra* note 11, at ¶ 5 at 782; *Leigh, supra* note 11, at ¶ 11 at 666–67; *Eakin, supra* note 11, at ¶ 8 at 647–48; *State ex rel. Okla. Bar Ass'n v. Lloyd,* 1990 OK 14, 787 P.2d 855, 858; *State ex rel. Okla. Bar Ass'n v. Stubblefield,* 1988 OK 141, ¶ 7, 766 P.2d 979, 982; *State ex rel. Okla. Bar Ass'n v. Cantrell,* 1987 OK 17, ¶ 1, 734 P.2d 1292, 1293; *State ex rel. Okla. Bar Ass'n v. Brandon,* 1969 OK 28, ¶ 5, 450 P.2d 824, 827.

panel are neither binding nor persuasive.[14] We are not restricted by the scope-of-review rules that govern corrective relief on appeal or in certiorari proceedings in which another tribunal's findings of fact may have to be left undisturbed by adherence to some law-imposed standards of deference.[15]

▮ ¶ 6 This court's duty can be discharged only if the trial panel submits a complete record of the proceedings.[16] Our initial task is to ascertain whether the materials are sufficient to permit (a) an independent determination of the critical facts and (b) the crafting of an appropriate measure of discipline.[17] The latter is that which (1) is consistent with the discipline imposed upon other lawyers who have committed similar acts of professional misconduct and (2) avoids the vice of visiting disparate treatment on the respondent lawyer.

¶ 7 Groshon admits, and the proof supports, the charge of professional misconduct. Upon consideration of the record, we conclude that its contents are adequate for this court's *de novo* consideration of respondent's professional misconduct.

### III.

### FACTS ADMITTED BY STIPULATION

▮ ¶ 8 The parties have tendered their stipulations by which respondent admits the facts which serve as the basis of the charges against him. A stipulation of fact is an agreement by the parties that a particular fact (or facts) in controversy stands admitted. It serves as an evidentiary substitute that dispenses with the need for proof of facts that are conceded by the parties' agreement. Stipulations are subject to the approval of the court in which they are entered.[18] Respondent's fact stipulations (a) have been made voluntarily and with knowledge of their meaning and legal effect and (b) are not inconsistent with any facts otherwise established by the record. We hence approve and adopt the parties' tendered stipulations.

### A.

### Count I

¶ 9 The charges against respondent arise from a client complaint that respondent made suggestive comments to and engaged in inappropriate touching of her of a sexual nature. Shortly after her divorce in February, 2000 Mrs. C. hired Groshon to represent her in an emergency hearing for child custody brought by her former husband.[19] Recognizing that she did not have the funds to pay him at that time for his legal services, respondent agreed to allow her to make payments whenever she was able to do so.[20] Respondent did not bill

---

**14.** *Schraeder, supra* note 11, at ¶ 5 at 573; *Cox, supra* note 11, at ¶ 5 at 782; *Eakin, supra* note 11, at ¶ 8 at 648; *Raskin, supra* note 11 at ¶ 11, at 265. The court's range of options in a disciplinary proceeding is set forth in RGDP Rule 6.15(a). Its terms provide:

"(a) The Supreme Court may approve the Trial Panel's findings of fact or make its own independent findings, impose discipline, dismiss the proceedings or take such other action as it deems appropriate."

**15.** *Schraeder, supra* note 11, at ¶ 5 at 573; *Cox, supra* note 11, at ¶ 5 at 782–83; *Eakin, supra* note 11 at ¶ 8 at 648; *Bolton, supra* note 11, at ¶ 15 at 344; *State ex rel. Okla. Bar Ass'n v. Perceful,* 1990 OK 72, ¶ 5, 796 P.2d 627, 630.

**16.** *Schraeder, supra* note 11, at ¶ 6 at 573; *Cox, supra* note 11, at ¶ 6 at 783; *Eakin, supra* note 11, at ¶ 9 at 648.

The terms of RGDP Rule 6.13 provide in part: "Within thirty (30) days after the conclusion of the hearing, the Trial Panel shall file with the Clerk of the Supreme Court a written report which shall contain the Trial Panel's findings of fact on all pertinent issues and conclusions of law (including a recommendation as to discipline, if such is found to be indicated, and a recommendation as to whether the costs of the investigation, record and proceedings should be imposed on the respondent), and shall be accompanied by all pleadings, a transcript of the proceeding, and all exhibits offered."

**17.** *Schraeder, supra* note 11, at ¶ 6 at 573; *Cox, supra* note 11, at ¶ 6 at 783; *Eakin, supra* note 11, at ¶ 9 at 648; *Bolton, supra* note 11, at ¶ 16 at 345; *Perceful, supra* note 15, at ¶ 5 at 630.

**18.** *Cox, supra* note 11, at ¶ 8 at 783; *State ex rel. Okla. Bar Ass'n v. Livshee,* 1994 OK 12, ¶ 7, 870 P.2d 770, 774.

**19.** Mrs. C. was the biological mother of the minor child. Her former husband adopted the child during the parties' marriage. Their divorce decree provided for a joint custody arrangement.

**20.** Respondent filed a motion for an attorney's fee for his work on the emergency hearing which was denied.

her for this service, nor did Mrs. C. make any effort to pay.

¶ 10 Over the next few months Mrs. C. continued to call respondent concerning other matters relating to the child custody issue, including harassment and nonpayment of alimony by her former husband, possible modification of the divorce decree and repeated threats by the ex-husband of taking custody of the minor child. During one of these conversations respondent asked Mrs. C. if she would like to go out or meet him for drinks. She refused. Respondent stipulated that he was not aware of nor did he ever advise her of the possible conflict of interest which might arise should she have accepted this invitation.[21] Respondent further admits that he made to his client various inappropriate and unprofessional comments of a sexual nature.[22] Mrs. C. indicates that because she was uncomfortable with the situation at this time she contacted other lawyers but found that none was willing to allow her the same fee arrangement as did respondent.

### B.

### Count II

¶ 11 In September of 2000 Mrs. C. contacted Groshon and indicated that her former husband had filed a motion to modify the divorce decree, asking for full custody of the parties' minor child, and that he be released from the duties of support alimony. Respondent informed Mrs. C. that she needed to make an appointment with his partner to sign a fee agreement with the firm. She complied with this request. On 18 April 2001 Mrs. C. met with respondent in his office to prepare for trial. She became emotional and began to cry.[23] Respondent came around his desk where Mrs. C. was sitting and embraced her. Respondent stipulates that he recalled the details of that meeting differently from Mrs. C.'s recollection but admits making improper sexual remarks to his client and touching Mrs. C. on both her breast and thigh. Although he agrees it does not excuse his behavior, he states that he believes his advances were welcomed by Mrs. C. as a consenting adult.

### C.

### Count III

¶ 12 The next day Mrs. C telephoned respondent's secretary to advise the office that she would be coming in to obtain a document she had left on respondent's desk, and an appointment was made for her with Groshon for the next day.[24] As a precaution she carried a recorder in her purse and subsequently taped the conversation between respondent and herself.[25] The tape reveals that respondent first made several remarks to Mrs. C. of a flirtatious and sexual nature when he passed by her in the reception area.[26] These comments, as well as conduct of a sexual nature, continued after Mrs. C. entered respondent's private office and at-

---

21. (Joint Stipulations, p. 4)

22. Although respondent does not recall his exact statements to Mrs. C. he admits that his conversation and conduct were of a flirtatious and sexual nature. Respondent did advise Mrs. C. that she should record her conversations with her ex-husband and recommended that a recording device be installed on her house phone and that she carry one in her purse in the event her former husband attempted to contact her outside her home. Respondent offered and Mrs. C. agreed to have him come to her house and install the recording device. Mrs. C. asserts that she agreed to this because she was financially limited. While at Mrs. C.'s house, both parties agree that they discussed Mrs. C.'s breast implant surgery but disagree about the details of that discussion.

23. In January of 2001 Mrs. C. remarried and began using her new surname.

24. Mrs. C. asserts that in her effort to leave respondent's office quickly, she forgot to get all of her materials.

25. Mrs. C., additionally, asked her niece to accompany her and wait in the car for her return. She was instructed by Mrs. C. to go into the law office in the event Mrs. C. did not return in forty-five minutes.

26. Upon seeing Mrs. C. in the reception area, that tape indicates respondent walked by her and stated, in part, "(Y)ou just couldn't stay away from me, huh? Oww! That flatters me. Well, darling what are you doing back?" When Mrs. C. indicated she had returned to obtain an original document she had left, respondent replied, "Okay, well come on into my lair—I mean my office." (Tape transcript, exhibit 3)

tempted to discuss her legal situation with him.[27] Respondent accompanied Mrs. C. to the office elevator which they both entered. The suggestive remarks and conduct continued until the parties exited the elevator.[28] Although respondent's description of the events differ in several aspects from those of Mrs. C., he agrees that he acted in an unprofessional manner by flirting with, hugging, and attempting to kiss and touch his client in a sexual manner. He maintains that he believed his advances were, at all times, invited and welcomed by Mrs. C.

¶ 13 A few days later Mrs. C. contacted Groshon's office requesting an itemized bill for the legal services provided. Mrs. C. obtained a new attorney and, on 22 May 2001, filed this grievance against respondent with the OBA.

¶ 14 Groshon is charged with (1) failure to provide competent representation to a client, ORPC Rule 1.1, (2) failure to inform a client and obtain consent where representation of that client may be limited by the lawyer's own interests, ORPC Rule 1.7(b)(2), (3) use of information relating to representation of a client to the disadvantage of the client without the client's consent, ORPC Rule 1.8(b), (4) failure to exercise independent professional judgment and render candid advice, ORPC Rule 2.1, (5) violating the Rules of Professional Conduct, ORPC Rule 8.4(a), (6) engaging in conduct that is prejudicial to the administration of justice, ORPC 8.4(d), and (7) the commission of an act which would reasonably be found to bring discredit upon the legal profession, whether or not the act is a felony, misdemeanor or a crime at all, RGDP Rule 1.3. Groshon stipulates that his actions violated these provisions. We accept respondent's stipulations—and find by clear and convincing evidence—that his admitted conduct offends each rule with whose violation he stands charged.

27. The tape reveals the following portion of the conversation between Mrs. C. and respondent. * * *

Groshon: "You alright?"
Mrs. C.: "Um, hmm."
Groshon: "You see I was getting all excited because I thought it was your hormones that brought you back down here and I thought I would get to chase you around a little bit more."
Mrs. C.: "No."
Groshon: "No?"
Mrs. C.: "Nuh-uh."
Groshon: "Oh."
Mrs. C.: "Stop! You're embarrassing me when you do that."
Groshon: "Why are you getting embarrassed?"
Mrs. C: "Cause you are making me turn red. I can feel it."
Groshon: "Well, that's alright."
Mrs. C.: (Exhaling)
Groshon: (Laughing) "You shouldn't be embarrassed."
Mrs. C.: "Why?"
Groshon: "Hm?"
Mrs. C.: "Why?"
Groshon: "Because you are one of the sexiest women I've met."
Mrs. C.: "Oh, thank you. (Laughing) Are you trying to earn brownie points?"
Groshon: "No, I've been coming on to you ever since I've met you."
Mrs. C.: "I know you have."
Mrs. C.: "Okay, I can't believe I walked out of here without these. I did so well to hang (sic) to these papers when I left (meaning her ex-husband). I was pretty upset though."
Groshon: "You were pretty upset when you left here?"
Mrs. C.: "About the whole scenario."

Groshon: "Hell, I thought I had you all excited when you left … that you wanted to see me again."
Mrs. C.: "(Laughing) Okay. Well, I won't keep you. I think there's a bunch of people out there."
Groshon: "Well, I'm getting ready to go to the courthouse anyway."
Mrs. C.: "Oh, really?"
Groshon: "I've got to file some stuff."
Mrs. C. "Okay."
Groshon: "You know you never bother me when you're here. You know there is always the that fantasy that your hormones will kick in and I'll get to do lewd and lascivious things to you." * * *
Mrs. C. "Stop. You need to behave yourself, stop! You're so bad!"
Groshon "I know it."
Mrs. C.: "You need to behave yourself!" * * *
Groshon: "I didn't know you had a tattoo." (referring to a tattoo on Mrs.C.'s right breast)
Mrs. C.: "Yeah, I had it lasered a couple of times." * * * (Tape transcript, exhibit 3)

28. The tape reveals the following conversation between respondent and client.

Groshon: "Trapped in an elevator!"
Mrs. C.: "Stop! It is dangerous being on an elevator with you."
Groshon: "Um humm! (Laughing) I'm going to go take a shower now."
Mrs. C.: "Yeah, you need to." * * * (Tape transcript, exhibit 3)

## IV.

### MITIGATING FACTORS

¶ 15 Mitigating circumstances may be considered in arriving at the assessment of the appropriate measure of discipline.[29] The PRT report contains numerous factors to be considered for purposes of mitigation. It states respondent: (1) was admitted to the practice of law in 1993 and has never been disciplined for professional misconduct, (2) has acknowledged and accepted responsibility for his professional misconduct, (3) has expressed sincere remorse for the harm his actions have caused to Ms. C. and to the reputation of the legal profession, and (4) has been fully cooperative in the investigation of this matter. In addition respondent's conduct appears to be an isolated incident rather than an ongoing pattern of acquittal towards female clients. We take these into account in determining the discipline to be imposed on the respondent.

## V.

### RESPONDENT'S MISCONDUCT WARRANTS A PUBLIC REPRIMAND

¶ 16 A license to practice law is not conferred for the benefit of the licensee, but for that of the public.[30] The disciplinary process, including the imposition of a sanction, is designed not to punish the delinquent lawyer, but to safeguard the interests of the public, the judiciary, and of the legal profession.[31] Disciplinary sanctions serve not only to deter the offending lawyer from committing similar acts in the future, but also operate to put others on notice that departures from ethical norms will not be tolerated. The disciplinary measure to be imposed upon the offending lawyer should be consistent with the quantum of discipline visited upon other practitioners for similar acts of professional misconduct.[32]

¶ 17 Extant jurisprudence teaches that a lawyer's sexual advances toward a client take advantage of the attorney-client relationship and constitute professional misconduct that will result in disciplinary action against the attorney when the matter is brought to the attention of the Bar.[33] Respondent should not have taken advantage of the professional relationship to approach Mrs. C. in a sexual manner. Because of the status of the attorney-client relationship, whether a lawyer believes an overture of a sexual nature is welcomed—or even encouraged—by a client in no way excuses the attorney's engaging in unprofessional conduct.[34]

29. *Schraeder, supra* note 11, at ¶ 27 at 578; *Cox, supra* note 11, at ¶ 11 at 784.

30. *Schraeder, supra* note 11, at ¶ 32 at 579; *Cox, supra* note 11, at ¶ 12 at 784.

31. *Schraeder, supra* note 11, at ¶ 32 at 579; *Cox, supra* note 11, at ¶ 12 at 784.

32. *Schraeder, supra* note 11, at ¶ 32 at 579.

33. *State ex rel. Oklahoma Bar Ass'n v. Sopher,* 1993 OK 55, ¶ 14, 852 P.2d 707, 711–12; *State ex rel. Bar Ass'n v. Copeland,* 1994 OK 21, ¶ 4, 870 P.2d 776, 777.

34. Some aspects of this proceeding's scenario are troubling. These include 1) the lengthy duration of the attorney-client relationship despite respondent's conduct and 2) Mrs. C.'s sometimes equivocal manner and responses in the recorded conversation that could be interpreted as flirtatious rather than as a firm, non-consensual response to respondent's advances. (See *supra* notes 27 and 28.) Ms. Farabow, the Assistant General Counsel, directly addressed the latter matter with Mrs. C. and before the PRT. Mrs. C. explained that she had been sexually molested as a child and learned that if she defended herself, it made matters worse than if she accepted the behavior or acted as if she enjoyed it. In light of Ms. Farabow's experience as a former prosecutor, she believes Mrs. C.'s explanation is an acceptable response. She filed charges because the "(t)ape sounds so very different from the actual reading of that transcript." (PRT report p. 7.) The former concern was tangentially addressed at the PRT hearing by Ms. Farabow's question to respondent: "Did it ever occur to you that because she didn't have the money and because of her limited background or educational background that she might have to appear to enjoy your advances or appear to flirt back with you so that she wouldn't lose you as an attorney?" Respondent's answer: "No. I can't say that that ever . . ."

We note these concerns solely in an effort to characterize the parties' relationship as presented by testimony before the PRT and recorded conversation. In no manner do we suggest that respondent's conduct is mitigated by these circumstances. Clients who seek a lawyer's assis-

¶ 18 The parties are in agreement concerning discipline and submit that a public censure is warranted for respondent's misconduct. The parties cite to *State ex rel. Bar Ass'n v. Sopher*[35] and *State ex rel. Oklahoma Bar Ass'n v. Copeland*[36] as precedent for their disciplinary recommendation.[37] *Sopher* and *Copeland* establish public censure as the proper disciplinary norm for unprofessional behavior that serves an attorney's personal interest in sexual gratification. We agree with the parties' recommendation. The Bar has a vital responsibility to effect the efficacious transition from what once, regrettably, may have been tolerated, if not indeed accepted, behavior to new standards of professional etiquette.[38] A public reprimand serves here the Bar's goal of giving unmistakable notice of its commitment to the enforcement of new standards.

## VI.

## SUMMARY

¶ 19 In sum, the record bears clear and convincing proof that respondent's participation in unprofessional conduct violates the rules that govern professional responsibility. After a thorough review of the record and due recognition of the factors tendered in mitigation,

¶ 20 **RESPONDENT IS ORDERED DISCIPLINED BY PUBLIC CENSURE AND DIRECTED TO PAY THE COSTS OF THIS PROCEEDING, WHICH SHALL BE DUE NOT LATER THAN NINETY DAYS AFTER THIS OPINION BECOMES FINAL.**

¶ 21 HODGES, LAVENDER, HARGRAVE, SUMMERS, AND WINCHESTER, JJ., CONCUR.

¶ 22 WATT, C.J., KAUGER AND BOUDREAU, JJ., CONCUR IN PART AND DISSENT IN PART.

¶ 23 BOUDREAU, J., with whom WATT, C.J., and KAUGER, J., join, concurring in part and dissenting in part.

I would impose a thirty-day suspension from the practice of law.

---

tance are often emotionally distraught. To take advantage of the attorney-client relationship for one's own gratification—even if one believes it is encouraged or welcomed—is a violation of the ORPC which is not to be tolerated.

35.  *Sopher, supra* note 33, at ¶ 14, at 712; *Copeland, supra* note 33, at ¶ 5 at 777.

36.  *Copeland, supra* note 33, at ¶ 5 at 777.

37.  Because there was no finding that respondent has engaged in a predatory pattern of sexual misconduct at clients' expense, the Assistant General Counsel did not believe that the discipline of suspension (as imposed in State *ex rel. Bar Ass'n v. Miskovsky*, 1997 OK 55, 938 P.2d 744) was warranted. (PRT transcript p. 55–57)

38.  Etiquette is "(t)he unwritten or conventional laws of courtesy observed between members of the same profession." CHAMBERS' TWENTIETH CENTURY DICTIONARY 319 (London & Edinburgh 1943). Professionalism is that conduct which binds a professional or deals with one who is not a client. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE 782 (Springfield, Mass.1961). "... the usages of professional intercourse." FUNK & WAGNALLS NEW COLLEGE STANDARD DICTIONARY 403 (New York 1947).