2009 OK 86

Bryant COLLIER, Plaintiff/Appellant,

v.

Kermit E. REESE, Clay Jenkins, Skylar Carter, Isaac Costello, Chase Evans, David Jenkins, Debra Jenkins, Michael Costello, Vonita Costello, Eric Evans, and Cathy Evans, Defendants/Appellees.

No. 106,817.

Supreme Court of Oklahoma.

Nov. 17, 2009.

Ashley M. Bibb, Todd Tucker, Neil Van Dalsem, Tulsa, OK, for Appellant Bryant Collier.

Kevin D. Buchanan, Bartlesville, OK, for Appellee, Kermit E. Reese.

Kristi K. Sanders, Bartlesville, OK, for Appellees, Skylar Carter, and Chase, Eric, and Cathy Evans.

KAUGER, J.

¶1 The issue presented[1] is whether the appellant's freedom of speech rights were violated when the trial court entered a gag order which ordered that: 1) any matter in the record relating to polygraph evidence be sealed from the public, news media, or any other third person; 2) the parties were prohibited from disclosing the polygraph information to the public or news media; and 3) the parties could not in the future file evidentiary matters until or unless the court had determined that the proffered filings were admissible evidence. The questions presented on appeal are whether: 1) the trial court's order is appealable; and 2) the trial court erred in issuing the order. We hold that: 1) under the facts presented, the trial court's order sealing the record, prohibiting dissemination of information, and precluding future filing without court approval is an interlocutory appealable order; and 2) the trial court abused its discretion when it issued an overly broad order sealing the record, or prohibiting dissemination, and prohibiting future filing without court approval.

## FACTS

¶2 On June 12, 2008, the plaintiff/appellant, Bryant Collier (Collier) was involved in a fight with the defendants/appellees, Kermit Reese, Clay Jenkins, Skylar Carter, Isaac Costello, and Chase Evans (collectively Reese and his friends) at a fast food restaurant in Bartlesville, Oklahoma. The record contains very few details regarding what happened before, during, or after the fight. However, it is clear that afterwards, Reese and his friends alleged that Collier started the fight by using a racial slur and threatening that he had a knife.

¶3 After the altercation, the District Attorney filed criminal charges against Reese and Skylar Carter alleging aggravated assault and battery.[2] The District Attorney also charged Collier with malicious harassment pursuant to 12 O.S.2001 § 850.[3] On July 2, 2008, Collier sued Reese and his friends in Washington County District Court

---

1. We are not addressing the issue of admissibility of polygraph tests in criminal or civil cases.

2. Title 21 O.S. Supp.2002 § 646 provides:

 A. An assault and battery becomes aggravated when committed under any of the following circumstances:
 1. When great bodily injury is inflicted upon the person assaulted; or
 2. When committed by a person of robust health or strength upon one who is aged, decrepit, or incapacitated, as defined in Section 641 of this title.
 B. For purposes of this section "great bodily injury" means bone fracture, protracted and obvious disfigurement, protracted loss or impairment of the function of a body part, organ or mental faculty, or substantial risk of death.
 Title 21 O.S. Supp.2002 § 647 provides:
 Aggravated assault and battery shall be punished by imprisonment in the State Penitentiary not exceeding five (5) years, or by imprisonment in a county jail not exceeding one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or both such fine and imprisonment.

3. Title 12 O.S.2001 § 850 provides in pertinent part:

 A. No person shall maliciously and with the specific intent to intimidate or harass another person because of that person's race, color, religion, ancestry, national origin or disability:
 1. Assault or batter another person;
 2. Damage, destroy, vandalize or deface any real or personal property of another person; or
 3. Threaten, by word or act, to do any act prohibited by paragraph 1 or 2 of this subsection if there is reasonable cause to believe that such act will occur.
 B. No person shall maliciously and with specific intent to incite or produce, and which is likely to incite or produce, imminent violence, which violence would be directed against another person because of that person's race,

for the intentional torts of assault and battery.[4] He sought damages for injuries, medical treatment, pain and suffering, and loss of income from the alleged assault and battery. One defendant, Clay Jenkins, also filed a counterclaim for assault and battery against Collier. He alleged that Collier had made two attempts to run over Jenkins with his vehicle two years earlier.

¶ 4 Collier insisted that both he and an eyewitness to the fight passed a lie detector test (lie detector/polygraph) which confirmed that he had not used the alleged racial slur or threatened the use of a knife to provoke the defendants. On August 22, 2008, Collier filed a motion to introduce the polygraph examination results as reliable scientific evidence. He also sought a *Daubert* hearing[5] on the admissibility of the test results. Three days later, Reese filed a motion to seal all portions of the record which disclosed any of the information related to the polygraph examination or its results because such evi-

---

color, religion, ancestry, national origin or disability, make or transmit, cause or allow to be transmitted, any telephonic, computerized, or electronic message.
C. No person shall maliciously and with specific intent to incite or produce, and which is likely to incite or produce, imminent violence, which violence would be directed against another person because of that person's race, color, religion, ancestry, national origin or disability, broadcast, publish, or distribute, cause or allow to be broadcast, published or distributed, any message or material.
D. Any person convicted of violating any provision of subsections A, B or C of this section shall be guilty of a misdemeanor on a first offense and a felony punishable by not more than ten (10) years incarceration in the custody of the Department of Corrections for a second or subsequent offense. The fine for a felony violation of this section shall not exceed Ten Thousand Dollars ($10,000.00). Furthermore, said person shall be civilly liable for any damages resulting from any violation of this section.
E. Upon conviction, any person guilty of a misdemeanor in violation of this section shall be punishable by the imposition of a fine not exceeding One Thousand Dollars ($1,000.00), or by imprisonment in the county jail for a period of not more than one (1) year, or by both such fine and imprisonment. . . .

4. Collier also asserted an indemnification claim against several of the friends' parents pursuant to 23 O.S.2001 § 10(A) which provides:

A. The state or any county, city, town, municipal corporation or school district, or any person, corporation ·or organization, shall be entitled to recover damages in a court of competent jurisdiction from a parent or parents of any child under the age of eighteen (18) years when the child is living with the parent or parents at the time of the act, and commits any criminal or delinquent act resulting in bodily injury to any person or damage to or larceny of any property, real, personal or mixed, belonging to the state or a county, city, town, municipal corporation, school district, person, corporation or organization. The amount of damages awarded pursuant to this

subsection shall not exceed Two Thousand Five Hundred Dollars ($2,500.00).
B. Any victim, or the victim's representative in the event of the victim's death, shall be entitled to recover damages in a court of competent jurisdiction from any person convicted of a violation of subsection B of Section 1273 of Title 21 of the Oklahoma Statutes or as otherwise allowed by law.

5. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–94, 113 S.Ct. 2786, 2796–97, 125 L.Ed.2d 469 (1993), the United States Supreme Court adopted the standard for determining whether scientific technique is admissible under the Federal Rules of Evidence. The *Daubert* factors include whether: 1) the testimony's underlying reasoning or methodology is scientifically valid and properly can be applied to the facts at issue; 2) the theory or technique in question can be (and has been) tested; 3) it has been subjected to peer review and publication, its known or potential error rate, and the existence and maintenance of standards controlling its operation; and 4) it has attracted widespread acceptance within a relevant scientific community. Title 12 O.S.2001 § 2702 also provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise.

The statute was amended effective November 1, 2009, and it incorporates the three tests for admissibility of scientific evidence. The new version provides:

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify in the form of an opinion or otherwise, if:
1. The testimony is based upon sufficient facts or data;
2. The testimony is the product of reliable principles and methods; and
3. The witness has applied the principles and methods reliably to the facts of the case.

dence is inadmissible. Reese also sought to prohibit any dissemination of the information to the public or news media. He insisted that Collier's lawyer had been making comments to the Bartlesville Examiner–Enterprise regarding the test results and that such dissemination would have a prejudicial effect on both the civil and criminal cases.

¶ 5 On August 25, 2008, the trial court issued an *ex parte* immediate order sealing the polygraph evidence in the record and prohibiting any public dissemination of it until further order of the Court. The court also set the matter for hearing on September 18, 2008. On September 2, 2008, Reese filed a motion to stay the civil proceedings until his criminal case was resolved. He also alleged that Collier was attempting to use the civil suit to influence the outcome of the criminal cases. On September 9, 2008, Reese filed an application for contempt against Collier's attorney for filing unsealed documents in an attempt to get information to the Bartlesville newspaper. The trial court also set the contempt hearing for September 18, 2008. Collier responded by seeking to vacate the *ex parte* order which sealed portions of the record and precluded dissemination of the test results to the public. He also demanded a jury trial concerning the contempt citation.

¶ 6 The matter culminated in a hearing on September 18, 2008. At the hearing, Reese argued that: 1) polygraph evidence is always inadmissible; 2) leaking the lie detector test results would materially prejudice the potential jury pool in both the criminal and civil cases; and 3) presenting the results to the court was merely an attempt to get them printed in the newspaper. Collier countered that he at least deserved the opportunity to present evidence to overcome the presumption that polygraph tests are unreliable and inadmissible. He also pointed out that a newspaper article had already been written

portraying him as a racist and that he took the lie detector test to counter the public allegation. According to Collier, immediately after the incident, his picture was "all over the Bartlesville paper with the Confederate flag hanging in front of him." [6] However, no newspaper articles appear in the record and apparently were not submitted to the Court.

¶ 7 After the hearing, the trial court, in three separate orders filed January 16, 2009: 1) stayed the civil cause, including discovery, until March 12, 2009; 2) set a *Daubert* hearing date of March 12, 2009, to determine the possible admissibility of the polygraph evidence; 3) ordered any document referencing the polygraph evidence be sealed and kept from public and media view until further order of the court; 4) prohibited dissemination of any information contained in the sealed record to the public, the press or any other third parties until further order of the court; and 5) required future proffered evidentiary matters be approved by the court as admissible evidence before filing.

■ ¶ 8 Collier appealed, arguing that the district court's order which sealed the record, prohibited dissemination, and required approval of all proffered evidentiary materials constituted an unconstitutional gag order/prior restraint which denied his right to defend himself and refute public allegations.[7] We retained the cause on August 25, 2009.

### I.

¶ 9 **UNDER THE FACTS PRESENTED, THE TRIAL COURT'S ORDER SEALING THE RECORD, PROHIBITING DISSEMINATION OF INFORMATION, AND PRECLUDING FUTURE FILING WITHOUT COURT APPROVAL IS AN APPEALABLE INTERLOCUTORY ORDER.**

■ ¶ 10 Reese and his friends assert that the order sealing the record is not ap-

---

**6.** Hearing transcript of September 18, 2009, p. 18, lines 8–9.

**7.** According to the Washington County docket, the criminal charges against Skylar Carter were dismissed on September 22, 2008, while the charges against Collier were eventually dismissed on December 15, 2008. Reese entered into a plea agreement on April 29, 2009, and received a deferred sentence. This Court takes judicial notice of the Dockets of District and Appellate Courts. *See State ex rel. Oklahoma State Board of Examiners of Certified Shorthand Reporters v. Parrish,* 2006 OK 91, ¶ 7 fn. 1, 152 P.3d 202; *Mehdipour v. State ex rel. Department of Corrections,* 2004 OK 19, ¶ 7 fn. 15, 90 P.3d 546; *Myers v. Lashley,* 2002 OK 14, ¶ 5, fn. 8, 44 P.3d 553.

pealable because it is not a final, appealable order or a certified interlocutory order.[8] However, Collier brought this cause as an appeal of the granting of a temporary injunction which is an interlocutory order appealable by right pursuant to Oklahoma Supreme Court Rule 1.60, 12 O.S.2001 Ch. 15, App. 1.[9]

¶ 11 Title 12 O.S.2001 § 1381 defines an injunction as a command to refrain from a particular act. It may be the final judgment in an action, or may be allowed as a provisional remedy, and, when so allowed, it shall be by order.[10] Under the facts of this case, given the breadth of the order that requires all polygraph related documents to be sealed until further order of the court, prohibits dissemination of polygraph information to anyone and everyone, and enjoins all future filings without court approval, we agree that the order meets the functional equivalent of an injunction. While the motion to seal the record was not labeled an "injunction,"[11] and the trial court did not

8. Title 12 O.S.2001 § 952 provides:

a) The Supreme Court may reverse, vacate or modify judgments of the district court for errors appearing on the record, and in the reversal of such judgment may reverse, vacate or modify any intermediate order involving the merits of the action, or any portion thereof.
(b) The Supreme Court may reverse, vacate or modify any of the following orders of the district court, or a judge thereof:
1. A final order;
2. An order that discharges, vacates or modifies or refuses to vacate or modify a provisional remedy which affects the substantial rights of a party; or grants, refuses, vacates, modifies or refuses to vacate or modify an injunction; grants or refuses a new trial; or vacates or refuses to vacate a final judgment;
3. Any other order, which affects a substantial part of the merits of the controversy when the trial judge certifies that an immediate appeal may materially advance the ultimate termination of the litigation; provided, however, that the Supreme Court, in its discretion, may refuse to hear the appeal. If the Supreme Court assumes jurisdiction of the appeal, it shall indicate in its order whether the action in the trial court shall be stayed or shall continue. The failure of a party to appeal from an order that is appealable under either subdivision 2 or 3 of subsection (b) of this section shall not preclude him from asserting error in the order after the judgment or final order is rendered.
Title 12 O.S.2001 § 953 provides:
An order affecting a substantial right in an action, when such order, in effect, determines the action and prevents a judgment, and an order affecting a substantial right, made in a special proceeding or upon a summary application in an action after judgment, is a final order, which may be vacated, modified or reversed, as provided in this article.

9. Oklahoma Supreme Court Rule 1.60, 12 O.S. 2001 Ch. 15, App. 1 provides:

Orders of the district court that are interlocutory and may be appealed by right in compliance with the rules in this part are those that:
(a) Grant a new trial or vacate a judgment on any ground, including that of newly discovered evidence or the impossibility of making a rec-

ord (12 O.S.1991 § 655, 12 O.S.1991 § 952(b)(2));
(b) Discharge, vacate or modify or refuse to discharge, vacate or modify an attachment (12 O.S.Supp.1993 § 993(A)(1));
(c) Deny a temporary injunction, grant a temporary injunction except where granted at an ex parte hearing, or discharge, vacate or modify or refuse to discharge, vacate or modify a temporary injunction (12 O.S.1981 § 952(b)(2) and 12 O.S.Supp.1993 § 993(A)(2));
(d) Discharge, vacate or modify or refuse to discharge, vacate or modify a provisional remedy which affects the substantial rights of a party (12 O.S.1991 § 952(b)(2) and 12 O.S.Supp.1993 § 993(A)(3));
(e) Appoint a receiver except where the receiver was appointed at an ex parte hearing, refuse to appoint a receiver or vacate or refuse to vacate the appointment of a receiver (12 O.S.Supp.1993 § 993(A)(4));
(f) Direct the payment of money pendente lite except where granted at an ex parte hearing, refuse to direct the payment of money pendente lite, or vacate or refuse to vacate an order directing the payment of money pendente lite (12 O.S.Supp.1993 § 993(A)(5));
(g) Certify or refuse to certify an action to be maintained as a class action (12 O.S.Supp. 1993 § 993(A)(6));
(h) Are enumerated in 58 O.S.1991 § 721 (interlocutory probate orders but not orders allowing a final account and granting a decree of distribution); or
(i) Are made under the provisions of 15 O.S. 1991 § 817.

10. Title 12 O.S.2001 § 1381 provides:

The injunction provided by this code is a command to refrain from a particular act. It may be the final judgment in an action, or may be allowed as a provisional remedy, and, when so allowed, it shall be by order. The writ of injunction is abolished. *See also* 12 O.S.2001 §§ 1382–1387 which describe the process by which a request for an injunction is heard by the trial court.

11. The meaning and effect of an instrument filed in court depends on its contents and substance

follow any of the formalities for granting an injunction, the nature of the relief sought [12] and the nature of the relief actually given was injunctive.[13] Accordingly, under these facts, we hold that the order is an appealable interlocutory order,[14] and we apply the same standard of review imposed for the issuance of a temporary injunction. That standard is whether the trial court abused its discretion or entered a decision against the evidence.[15]

## II.

**¶ 12 THE TRIAL COURT ABUSED ITS DISCRETION IN ISSUING AN OVERLY BROAD ORDER SEALING THE RECORD, PROHIBITING DISSEMINATION, AND PROHIBITING FUTURE FILING WITHOUT COURT APPROVAL.**

¶ 13 Reese argues that the trial court was required to seal the record because: 1) polygraph evidence is clearly inadmissible in any civil or criminal proceeding; and 2) allowing the public to learn of the lie detector test results would have a prejudicial impact on both civil and criminal cases; and 3) providing the information would violate the rules of professional conduct and local court rules. Collier contends that: 1) the issue of admissi-

bility of polygraph evidence is irrelevant; 2) the trial court's order was based on bald speculation without any evidence that either the criminal or civil trials would be prejudiced; 3) any prejudicial effect would be minimal; and 4) the order clearly violates his Constitutional right to speak freely about the case and respond to public allegations that he is a racist.

### a. Polygraph evidence is inadmissable in civil or criminal proceedings.

¶ 14 The Oklahoma Court of Criminal Appeals has held that polygraph evidence is inadmissible in criminal proceedings,[16] and this Court has previously addressed the admissibility of polygraph evidence in civil proceedings. In *Hames v. Anderson,* 1977 OK 191, ¶ 8, 571 P.2d 831, a slander lawsuit, the plaintiff had voluntarily taken a lie detector test, and this fact was referenced to the jury. No attempt was made to introduce the test results, and the trial court instructed the jury that such results were not admissible. We discouraged any reference to polygraph tests in the presence of the jury in future cases, but held any error in the reference to be harmless.[17]

---

rather than on the form or title given it by the author. *Whitehorse v. Johnson,* 2007 OK 11, ¶ 8 fn. 13, 156 P.3d 41; *Neumann v. Arrowsmith,* 2007 OK 10, ¶ 8, 164 P.3d 116.

12. Injunction proceedings are equitable in nature. *Brown ex rel. Brown v. Oklahoma Secondary School Activities Ass'n,* 2005 OK 88, ¶ 11, 125 P.3d 1219. *See City of Bartlesville v. Ambler,* 1971 OK 154, ¶ 24, 499 P.2d 433; *Leathers v. Commercial National Bank in Muskogee,* 1965 OK 200, ¶¶ 15–16, 410 P.2d 541.

13. We note that our decision is limited to the facts presented and does not address or affect the appealability of any ordinary discovery protective order issued pursuant to 12 O.S. Supp.2004 § 3226.

14. Other courts have similarly considered "restraining" type orders such as the one involved here as injunctions for purposes of appealability. *See James v. Hines,* 63 S.W.3d 602, 607 (Ky.App. 1998); *Reiter v. Mason,* 563 So.2d 749, 751 (Fla. App.1990); *Cummings v. Beaton & Associates, Inc.,* 192 Ill.App.3d 792, 796, 139 Ill.Dec. 908, 549 N.E.2d 634 (1990). *See also* our own Court of Civil Appeals which recognized in *First American Bank & Trust Co. v. Sawyer,* 1993 OK CIV APP 115, ¶ 9, 865 P.2d 347, that an interlocutory order which temporarily enjoined the appellant

from distributing handbills and making statements in front of bank was an interlocutory order of temporary injunction appealable by right; and *House of Sight & Sound, Inc. v. Faulkner,* 1995 OK CIV APP 112, ¶ 8, 912 P.2d 357, wherein the injunctive relief was an action to enjoin attorneys from advertising of another lawsuit in an attempt to get additional plaintiffs in that lawsuit.

15. *Brown ex rel. Brown v. Oklahoma Secondary School Activities Ass'n,* see note 12, supra; *Sharp v. 251st St. Landfill, Inc.,* 1996 OK 109, ¶ 4, 925 P.2d 546; *State ex rel. Schulte v. Hallco Environmental, Inc.,* 1994 OK 138, ¶ 2, 886 P.2d 994.

16. *Paxton v. State,* 1993 OK CR 59, ¶ 42, 867 P.2d 1309, *cert. denied* 513 U.S. 886, 115 S.Ct. 227, 130 L.Ed.2d 153 (1994) [recently reaffirming that, at least in the criminal context, polygraph test results are not admissible for any purpose]; *State v. Cook,* 1978 OK CR 15, ¶ 2, 574 P.2d 1073 [Polygraph test results admitted for any purpose is error.].

17. The Court of Civil Appeals in *Hennessee v. Mathis,* 1987 OK CIV APP 35, ¶ 13, 737 P.2d 958, held that introduction of polygraph results through argument of council is reversible error, even without a timely objection.

¶ 15 In *Conti v. Republic Underwriters Insurance Company,* 1989 OK 128, ¶¶ 18–19, 782 P.2d 1357, we addressed the admissibility of polygraph test results in the context of a bad faith breach of contract action brought by a policyholder against an insurer. The Court again recognized that polygraph test results are generally inadmissible, but noted that the appellant had provided no evidence suggesting that such test results were any more reliable or that the prejudicial effect of polygraph evidence had been overcome to any greater degree than when the *Hames* case was decided in 1977. However, we allowed the trial court to take the polygraph results into account when it considered the appellant's motion for a directed verdict because it was relevant to establish whether the defendant acted in bad faith.

¶ 16 The United States Supreme Court recognized in *United States v. Scheffer,* 523 U.S. 303, 309–10, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998), when it affirmed a *per se* rule against the admission of polygraph evidence in court martial proceedings, that there is simply no consensus among the federal courts, the state courts, or the scientific community about the reliability of polygraph techniques.[18]

¶ 17 Today, we reaffirm that polygraph evidence is inadmissible in criminal

---

18. *United States v. Scheffer,* 523 U.S. 303, 309–10, 118 S.Ct. 1261, 1265, 140 L.Ed.2d 413 (1998), stated that:

The contentions of respondent and the dissent notwithstanding, there is simply no consensus that polygraph evidence is reliable. To this day, the scientific community remains extremely polarized about the reliability of polygraph techniques. 1 D. Faigman, D. Kaye, M. Saks, & J. Sanders, Modern Scientific Evidence 565, n. †, § 4–2.0, to § 14–7.0 (1997); see also 1 P. Giannelli & E. Imwinkelried, Scientific *310 Evidence § 8–2(C), pp. 225–227 (2d ed. 1993) (hereinafter Giannelli & Imwinkelried); 1 J. Strong, McCormick on Evidence § 206, p. 909 (4th ed. 1992) (hereinafter McCormick). Some studies have concluded that polygraph tests overall are accurate and reliable. See, e.g., S. Abrams, The Complete Polygraph Handbook 190–191 (1989) (reporting the overall accuracy rate from laboratory studies involving the common "control question technique" polygraph to be "in the range of 87 percent"). Others have found that polygraph tests assess truthfulness significantly less accurately-that scientific field studies suggest the accuracy rate of the "control question technique" polygraph is "little better than could be obtained by the toss of a coin," that is, 50 percent. See Iacono & Lykken, The Scientific Status of Research on Polygraph Techniques: The Case Against Polygraph Tests, in 1 Modern Scientific Evidence, supra, § 14–5.3, at 629 (hereinafter Iacono & Lykken).

This lack of scientific consensus is reflected in the disagreement among state and federal courts concerning both the *311 admissibility and the reliability of polygraph evidence. Although some Federal * *1266 Courts of Appeals have abandoned the per se rule excluding polygraph evidence, leaving its admission or exclusion to the discretion of district courts under *Daubert, see, e.g., United States v. Posado,* 57 F.3d 428, 434 (C.A.5 1995); *United States v. Cordoba,* 104 F.3d 225, 228 (C.A.9 1997), at least one Federal Circuit has recently reaffirmed its *per se ban, see United States v. Sanchez,* 118 F.3d 192, 197 (C.A.4 1997), and another recently noted that it has "not decided whether polygraphy has reached a sufficient state of reliability to be admissible." *United States v. Messina,* 131 F.3d 36, 42 (C.A.2 1997). Most States maintain per se rules excluding polygraph evidence. See, e.g., *State v. Porter,* 241 Conn. 57, 92–95, 698 A.2d 739, 758–759 (1997); *People v. Gard,* 158 Ill.2d 191, 202–204, 198 Ill.Dec. 415, 421, 632 N.E.2d 1026, 1032 (1994); *In re Odell,* 672 A.2d 457, 459 (R.I.1996) (per curiam); *Perkins v. State,* 902 S.W.2d 88, 94–95 (Ct.App.Tex.1995). New Mexico is unique in making polygraph evidence generally admissible without the prior stipulation of the parties and without significant restriction. See N.M. *312 Rule Evid. § 11–707.FN8 Whatever their approach, state and federal courts continue to express doubt about whether such evidence is reliable. See, e.g., *United States v. Messina, supra,* at 42; *United States v. Posado, supra,* at 434; *State v. Porter, supra,* at 126–127, 698 A.2d, at 774; *Perkins v. State, supra,* at 94; *People v. Gard, supra,* at 202–204, 198 Ill.Dec. 415, 632 N.E.2d, at 1032; *In re Odell, supra,* at 459. The approach taken by the President in adopting Rule 707–excluding polygraph evidence in all military trials-is a rational and proportional means of advancing the legitimate interest in barring unreliable evidence. Although the degree of reliability of polygraph evidence may depend upon a variety of identifiable factors, there is simply no way to know in a particular case whether a polygraph examiner's conclusion is accurate, because certain doubts and uncertainties plague even the best polygraph exams. Individual jurisdictions therefore may reasonably reach differing conclusions as to whether polygraph evidence should be admitted. We cannot say, then, that presented with such widespread uncertainty, the President acted arbitrarily or disproportionately in pro-

and civil proceedings. However, Collier asked for an opportunity to show its alleged scientific reliability, and the trial court scheduled a hearing to allow him the opportunity to provide evidence that such test results are now more reliable or that the prejudicial effect of polygraph evidence has been overcome to a greater degree than when *Hames* or *Conti* was decided. This hearing has not been held. While it is extremely unlikely that the evidence would be deemed admissible, this issue is largely irrelevant due to the overly broad gag order under review today as discussed below.

### b. Abuse of discretion in sealing the record.

 ¶ 18 The Oklahoma Constitution, art. 2, § 22 [19] guarantees, and precludes re-

mulgating a per se rule excluding all polygraph evidence. (Citations and Footnotes omitted.)

19. The Okla. Const. art. 2, § 22 provides:
Every person may freely speak, write, or publish his sentiments on all subjects, being responsible for the abuse of that right; and no law shall be passed to restrain or abridge the liberty of speech or of the press. In all criminal prosecutions for libel, the truth of the matter alleged to be libelous may be given in evidence to the jury, and if it shall appear to the jury that the matter charged as libelous be true, and was written or published with good motives and for justifiable ends, the party shall be acquitted.
*Gaylord Entertainment Co. v. Thompson,* 1998 OK 30, ¶ 13, 958 P.2d 128.

20. The United States Constitution, First Amendment provides:
Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. This right is made applicable to the states through the United States Constitution Fourteenth Amendment which provides in pertinent part:
... No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. ...
The Oklahoma Constitution's protections of free speech have been recognized as far more broadly worded than the First Amendment's restrictions.

straint of, freedom of speech, as does the United States Constitution.[20] While the free-speech guarantee gives each citizen an equal right to self-expression and to participation in self-government, the right to freedom of speech has never been considered absolute.[21] While this freedom has generally been held to require a presumption of public access to judicial proceedings, this right is likewise not absolute.[22] Here, for instance, the plaintiff's right to defend himself both inside and outside the courthouse must be balanced with the fundamental right to a fair trial—not only for Collier but for the other defendants who also face criminal charges.[23] Courts in this state are under a duty to ensure to its citizens a fair trial or impartial jury, and the courts possess the power to exercise that duty wherever public or private interest requires.[24]

*Gaylord Entertainment Co. v. Thompson,* see note 19, supra at ¶ 13, fn. 24.

21. *Gaylord Entertainment Co. v. Thompson,* see note 19, supra at ¶ 19; *McCormack v. Oklahoma Publishing Co.,* 1980 OK 98, ¶ 16, 613 P.2d 737,

22. *See generally* Kristine Cordier Karnezis, J.D., Annot., *Restricting Public Access to Judicial Records of State Courts,* 84 A.L.R.3d 598 (1978).

23. The United States Constitution, Sixth Amendment provides:
In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence.[sic]
In *Sheppard v. Maxwell,* 384 U.S. 333, 358, 86 S.Ct. 1507, 1520, 16 L.Ed.2d 600 (1966), the United States Supreme Court held that the failure of the trial judge in a murder prosecution to protect the defendant from inherently prejudicial publicity which saturated the community with extensive news coverage and to control disruptive influences in courtroom deprived defendant of a fair trial consistent with due process. This case garnered so much publicity that the story was developed into a television series and a movie.

24. *See Boston v. Buchanan, M.D.,* 2003 OK 114, ¶ 1 fn. 1, 89 P.3d 1034; *State v. Martin,* 1927 OK 147, ¶ 5, 256 P. 681.

¶ 19 This delicate balance [25] is expressly recognized in the Oklahoma Rules of Professional Conduct, Rule 3.6, 5 O.S.2001 Ch. 1, App. 3-a, which prohibit a lawyer participating in litigation from making extrajudicial statements which would have a prejudicial effect on the fact-finding process.[26] There is also a recognized need in a free, self-governing society for dissemination of information of fundamental importance to the people, including media coverage, which is of public interest.[27] When the September 18, 2008, hearing was held: 1) the admissibility of the polygraph evidence was in question; 2) both sides recognized that the purpose of using such evidence was to respond to a newspaper article which allegedly implied that Collier was a racist; 3) Collier, Reese, and one of Reese's friends had been criminally charged. Accordingly, we are not unmindful that the matter was most certainly of public interest—at least in Bartlesville, Oklahoma.[28]

¶ 20 The heart of the issue here is the trial court's prior restraint of the plaintiff, Collier, from publicly defending himself from being labeled a racist against the backdrop of pending criminal charges.[29] The doctrine known as prior restraint regulates certain speech-related activities in advance, as opposed to retrospectively punishing such ac-

**25.** The United States Supreme Court in *Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1074, 111 S.Ct. 2720, 2744, 115 L.Ed.2d 888 (1991), recognized that Nevada's "balance" test as being a "substantial likelihood of material prejudice" satisfied the Constitution and that "clear and present danger" of actual prejudice or imminent threat was not required in such circumstances. In other words, the speech of lawyers representing clients in pending cases may be regulated under a less demanding standard than that established for regulation of the press.

**26.** Title 5 O.S.2001 Ch. 1, App. 3-A provides:

Rule 3.6. Trial Publicity

(a) A lawyer who is participating or has participated in the investigation or litigation of a matter shall not make an extrajudicial statement that a reasonable lawyer would expect to be disseminated by means of public communication if the lawyer knows or reasonably should know that it will have an imminent and materially prejudicial effect on the fact-finding process in an adjudicatory proceeding relating to the matter and involving lay fact-finders or the possibility of incarceration.

(b) Notwithstanding paragraph (a), a lawyer may make a statement that a reasonable lawyer would believe is required to protect a client from the substantial undue prejudicial effect of recent publicity not initiated by the lawyer or the lawyer's client. A statement made pursuant to this paragraph shall be limited to such information as is necessary to mitigate the recent adverse publicity.

(c) No lawyer associated in a firm or government agency with a lawyer subject to paragraph (a) shall make a statement prohibited by paragraph (a).

The comments to the Rule 3.6 also recognize that: 1) subjects such as credibility of a party are more likely than others to have a materially prejudicial effect on a proceeding; and 2) lawyers should not disclose information that the lawyer knows is likely to be inadmissible evidence at trial that would, if disclosed, create an imminent and material risk of prejudicing an impartial trial. Title 5 O.S.2001 Ch. 1, App. 3-A comments provide in pertinent part:

... [5] There are, on the other hand, certain subjects which are more likely than others to have a materially prejudicial effect on a proceeding, particularly when they refer to a civil matter triable to a jury, a criminal matter, or any other proceeding that could result in incarceration. These subjects relate to:

(1) the character, credibility, reputation or criminal record of a party, suspect in a criminal investigation or witness, or the identity of a witness, or the expected testimony of a party or witness; ...

(3) the performance or results of any examination or test or the refusal or failure of a person to submit to an examination or test, or the identity or nature of physical evidence expected to be presented;

(4) any opinion as to the guilt or innocence of a defendant or suspect in a criminal case or proceeding that could result in incarceration;

(5) information that the lawyer knows or reasonably should know is likely to be inadmissible as evidence in a trial and that would, if disclosed, create an imminent and material risk of prejudicing an impartial trial; or ...

**27.** See *Gaylord Entertainment Co. v. Thompson*, note 19, supra.

**28.** When one becomes involved in a law violation and identified with a crime, the right of privacy is at risk of apprehension and that person becomes a public figure in which the public has more than an ordinary interest. *See Lyles v. State*, 1958 OK CR 79, ¶ 10, 330 P.2d 734.

**29.** Although the criminal charges were later dismissed, see discussion ¶ 8, page 8, fn 7, supra, at the time the trial court decided the prior restraint matter, the charges were pending and, consequently, a consideration before the trial court.

tivities.[30] It is designed to prevent self-censorship.[31] This Court has generally recognized that a law or an order restraining such conduct must have a close enough nexus to expression, or expression related conduct, to pose a real and substantial threat of the identified censorship risks.[32] We have also noted that in order for a prior restraint to withstand constitutional attack, it must be narrowly drafted so as to suppress only that speech which presents a clear and present danger of resulting in serious, substantial evil.[33]

¶ 21 However, other courts have also noted that, while judicial records of the state should always be accessible to the people for all proper purposes, access may be restricted where the purpose is to gratify private spite or promote public scandal.[34] Additionally, here, we are faced with the issue of arguably inadmissible evidence which may not be used at trial or used to adjudicate a material controversy. Some courts, including the United States Supreme Court, have recognized that in the limited context of pretrial discovery, an order prohibiting dissemination of discovered information before trial is not the kind of classic prior restraint that requires the same exacting constitutional scrutiny.[35]

¶ 22 Nevertheless, even though this cause is a civil matter, the trial court was also faced with considering the impact such inadmissible polygraph evidence might have on the criminal charges.[36] The only evidence presented to the trial court on the issue of a

**30.** *In re Initiative Petition No. 341, State Question No. 627*, 1990 OK 53, ¶ 10, 796 P.2d 267; *See also World Publishing Co. v. White*, 2001 OK 48, ¶ 1 fn. 1, 32 P.3d 835.

**31.** *In re Initiative Petition No. 341, State Question No. 627*, see note 30, supra; *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757–58, 108 S.Ct. 2138, 2143–44, 100 L.Ed.2d 771 (1988).

**32.** *In re Initiative Petition No. 341, State Question No. 627*, see note 30, supra; *City of Lakewood v. Plain Dealer Publishing Co.*, see note 31, supra. The United States Supreme Court in *Nebraska Press Assn. v. Stuart*, 427 U.S. 539, 562, 96 S.Ct. 2791, 2804, 49 L.Ed.2d 683 (1976), addressed the constitutionality of an order prohibiting the press from publishing certain information disclosed in trial. While the opinion does not impose an absolute ban on prior restraints, the trial judge is required to examine the evidence and determine: 1) the nature and extent of the pretrial news coverage; 2) whether other measures would be likely to mitigate the effects of unrestrained pretrial publicity; and 3) how effectively a restraining order would operate to prevent the threatened danger. 427 U.S. at 562, 96 S.Ct at 2804.

**33.** *State ex rel. Department of Transportation v. Pile*, 1979 OK 152, ¶ 9, 603 P.2d 337 *cert. denied* 453 U.S. 922, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981); *Hennessey v. Independent School Dist. No. 4, Lincoln County*, 1976 OK 101, ¶ 12, 552 P.2d 1141.

**34.** *Kamakana v. City and County of Honolulu*, 447 F.3d 1172, 1179 (9th Cir.2006); *State ex rel. The Cincinnati Enquirer v. Winkler*, 149 Ohio App.3d 350, 355, 777 N.E.2d 320, 324 (2002).; *Stevenson v. News Syndicate Co.*, 276 A.D. 614, 96 N.Y.S.2d 751, 756 (N.Y.App.Div.1950); *In re Caswell*, 18 R.I. 835, 29 A. 259, 27 L.R.A. 82 (1893).

**35.** *Seattle Times Co., v. Rhinehart*, 467 U.S 20, 33, 104 S.Ct. 2199, 2208, 81 L.Ed.2d 17 (1984)[Where protective order entered on showing of good cause is limited to pretrial discovery and does not restrict the dissemination of the information if gained from other sources in addition to discovery, it does not offend the First Amendment.]; *See Press–Enterprise Co. v. Superior Court of California*, 478 U.S. 1, 106 S.Ct. 2735, 92 L.Ed.2d 1 (1986) [Standard for closure of preliminary hearings was lessor standard that reasonable likelihood existed that media access would deprive defendant of fair trial.]; *See also Level 3 Communications, LLC v. Limelight Networks, Inc.*, 611 F.Supp.2d 572 (E.D.Va.2009)[Pretrial exhibits became subject to First Amendment scrutiny because they were offered and entered into evidence.]; *Chao v. Estate of Fitzsimmons*, 349 F.Supp.2d 1082, 1085 (N.D.Ill.2004) [Report of independent special counsel which did not provide any basis for judicial action were not subject to public access.]; *Mercury Interactive Corporation v. Klein*, 158 Cal.App.4th 60, 70 Cal.Rptr.3d 88, 95 (2007)[Discovery material does not automatically become subject to a presumptive right of access once it is fixed in civil litigation.].

**36.** Research reveals only one case involving a similar gag order and polygraph test results. In *State v. Hartman*, 703 S.W.2d 106, 116 (Tenn. 1986) the Tennessee Supreme Court reviewed an order in a criminal case in which the trial court prohibited the defense counsel from referring to polygraph examinations given to witnesses and defendant. The Court summarily upheld the order without addressing any constitutional challenges, noting that the inadmissibility of polygraph tests was not questioned. This case was later overruled on other grounds.

fair criminal trial was speculation by the parties that a fair trial might not be had if polygraph information were made public. No evidence was taken regarding how severe this threat actually was under the facts of this cause. Had a fair criminal trial been threatened, Oklahoma law provides for a change of venue if appropriate to ensure a fair trial.[37] Additionally, the trial court's order was not narrowly tailored because even if a change of venue were unnecessary, the parties could have handled the matter during *voir dire;* or the trial court could instruct the jury that polygraph tests results are inadmissible in criminal and civil cases because the results are unreliable. Alternatively, the trial court could have conditioned disclosure of the test results to the media on a qualification that such results are inadmissible in civil or criminal court proceedings because they are not reliable. Any of these alternatives

would have been available without any threat to free speech, rather than to completely restrain disclosure of the test results altogether.

¶ 23 However, the order went even further by prohibiting any evidentiary filings without the trial court's determination that the proffered filings were admissible evidence. This restriction was also unnecessary because the question of admissibility could have been addressed at any time before the evidence is presented to the trier of fact. All kinds of admissible and inadmissible evidence is gathered in the discovery process which may be later deemed inadmissible before the fact finder. Given all of the less restrictive alternatives which would have ensured both a fair criminal and civil trial, at this stage of the proceedings, we hold that the trial court abused its discretion in issuing the prior restraint order.[38]

**37.** Title 12 O.S.2001 § 140 provides:
In all cases in which it is made to appear to the court that a fair and impartial trial cannot be had in the county where the suit is pending, the court may, on application of either party, change the place of trial to some county where such objections do not exist.
*See also* 22 O.S.2001 § 561 (change of venue for criminal cases). A change of venue is proper if the influences of the news media, either in the community at large or in the courtroom itself, pervade the proceedings, or when the entire circumstances surrounding the trial indicate the defendant will not receive a fair trial. *Nichols v. Jackson,* 2001 OK CR 35, ¶ 17, 38 P.3d 228; *Allen v. State,* 1993 OK CR 49, ¶¶ 6–7, 862 P.2d 487, *cert. denied* 511 U.S. 1075, 114 S.Ct. 1657, 128 L.Ed.2d 375 (1994).

**38.** Although the question depends upon the facts of each case, other state courts have reached similar results particularly when the trial court neglected to consider other less restrictive alternatives. *State ex rel. Missoulian v. Montana Twenty–First Judicial District Court,* 281 Mont. 285, 933 P.2d 829, 842 (1997)[Trial court order that all evidentiary material filed in homicide prosecution be filed under seal and prohibiting parties from discussing case outside of courtroom could only be entered upon finding speech posed substantial possibility of harm, regardless of parties' consent.]; *Twohig v. Blackmer,* 121 N.M. 746, 754, 918 P.2d 332, 340 (1996)[Gag order in vehicular homicide prosecution prohibiting parties from making extrajudicial statements to media or public was not constitutionally valid.]; *State v. Bassett,* 128 Wash.2d 612, 911 P.2d 385 (1996) [Order prohibiting statements about murder case to press or public, even though such pretrial publicity could make find-

ing a jury difficult in small community, was invalid because court failed to consider adequacy of alternative such as voir dire, cautionary instructions, change of venue, continuance, and sequestration of jury.]; *Breiner v. Takao,* 73 Haw. 499, 835 P.2d 637, 642 (1992)[In criminal context, trial court failed to find serious threat and failed to consider other alternative to order prohibiting trial participants from communicating with the media regarding any aspect of trial.]; *Davenport v. Garcia,* 834 S.W.2d 4, 11 (1992) [Gag order prohibiting all discussion of civil case outside of courtroom was unconstitutional where order failed to identify any perceived miscommunication, did not indicate imminent harm, and offered no explanation of why such harm could not be cured by remedial action.]; *Kemner v. Monsanto Co.,* 112 Ill.2d 223, 245, 492 N.E.2d 1327, 1337, 97 Ill.Dec. 454, 464 (1986)[In civil context, gag order prohibiting company from communicating with the media was vague and over-broad and based on mere possibility that a fair trial was threatened.]; Federal Courts have also reached similar results. *United States v. Salameh,* 992 F.2d 445, 447 (2nd Cir.1993)[Order barring defense counsel from publically discussing any aspect of criminal case violated First Amendment rights.]; *CBS Inc. v. Young,* 522 F.2d 234, 242 (6th Cir.1975) [Order prohibiting plaintiff and defendant from discussion in any manner whatsoever the case with members of news media or public invalid.]; *Chase v. Robson,* 435 F.2d 1059, 1062 (7th Cir.1970) [Order prohibiting defendants from making public statements in criminal case was invalid.]. *But see United States v. Koubriti,* 307 F.Supp.2d 891, 900 (E.D.Mich.2004) wherein district court entered order precluding discussion of sealed information even though jury had rendered verdict and

## CONCLUSION

¶ 24 Although there may be certain circumstances where sealing at least a portion of the record serves an important function, a sealed record is a burden on the courts and an extreme inconvenience to attorneys.[39] Nevertheless, regardless of whether the information presented may or may not later be determined to be admissible before the trier of fact, the order sealing this record must fail because: 1) no effort was made to show that the alleged threat to a fair trial by a public reference to polygraph evidence was anything more than a possibility; 2) the order was overly broad to serve its intended purpose; and 3) there were many less restrictive alternatives available to the trial court which would have served the same purpose with less severe restrictions imposed. Accordingly, we reverse the trial court's order sealing the record.

**TRIAL COURT REVERSED; CAUSE REMANDED.**

EDMONDSON, C.J., TAYLOR, V.C.J., OPALA, KAUGER, COLBERT, REIF, JJ., concur.

HARGRAVE, WATT, WINCHESTER, JJ., concur in part/dissent in part.

case was in post-trial stage; and *United States v. Brown;* 218 F.3d 415, 429–30 (5th Cir.2000), *cert. denied* 531 U.S. 1111, 121 S.Ct. 854, 148 L.Ed.2d 769 (2001) [Wherein court held that gag order prohibiting public discussion was based on substantial likelihood that extrajudicial commentary would undermine fair trial.].

39. *Davis v. Davis,* 997 So.2d 149, 161 (La.App. 2 Cir.2008).

1. In *Richmond Newspapers, Inc. v. Virginia,* 448 U.S. 555, 569, 570–72, 589, 100 S.Ct. 2814, 2823–25, 2834, 65 L.Ed.2d 973 (1980), the Court held **the public had a First Amendment right to attend criminal trials.** Public access to criminal trials **enhances the quality** and safeguards the integrity of factfinding and **functions** as a check on the judicial and governmental process (*Globe Newspaper Co. v. Superior Court for County of Norfolk,* 457 U.S. 596, 606, 102 S.Ct. 2613, 2619, 73 L.Ed.2d 248 (1982) (access to criminal trial); *Richmond Newspapers, Inc. v. Virginia, supra,* 448 U.S. at 569, 570–72, 589, 100 S.Ct. at 2823–25; and assures an appearance of fairness, *Press–Enterprise, Co. v. Superior Court,* 464 U.S. 501, 104 S.Ct. 819, 823, 824, 78 L.Ed.2d 629 (1986) (access to criminal pretrial proceeding).

2. "At the heart of the First Amendment is the recognition of the fundamental importance of the

OPALA, J., concurring

¶ 1 I join the court's opinion and state my views in its support.

¶ 2 At issue here is whether the trial court (by sealing the polygraph test results) disrupted the free flow of information that did not pose a threat to the fair administration of judicial process. Because I would also answer this question in the affirmative, I concur in today's disposition.

¶ 3 Courts are powerless to impede the free flow of information-either to society at large or to the media—unless there be proof that immediately threatened is their ability to conduct and manage judicial process for fair and due application of the law.[1]

¶ 4 The First Amendment's free-speech and free-press clauses are a command to all the three branches of government not to interfere with the free flow of information.[2] The judiciary is the guardian of these clauses to ensure the government's obedience to their commands. Judges constitute no exception from obedience to the clear command.[3] The constitutional mandate for the

free flow of ideas and opinions on matters of public interest and concern." *Hustler Magazine v. Falwell,* 485 U.S. 46, 50, 108 S.Ct. 876, 879, 99 L.Ed.2d 41 (1988); *Associated Press v. United States,* 326 U.S. 1, 20, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (the First Amendment commands that "the government ... shall not impede the free flow of ideas"); *New York Times v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964) (in discussing the First Amendment's free-speech-and-free-press guarantees, the Court reiterated a "... profound national commitment to the principle that debate on public issues should be uninhibited, robust and wide open...."); *Globe Newspaper Co. v. Superior Court, supra* note 2, 457 U.S. at 604, 102 S.Ct. at 2619 (the " 'major purpose of [the First] Amendment was to protect the free discussion of governmental affairs ....' ") (quoting *Mills v. Alabama,* 384 U.S. 214, 218, 86 S.Ct. 1434, 1436, 16 L.Ed.2d 484 (1966)); *Publicker Industries, Inc. v. Cohen,* 733 F.2d 1059, 1070 (3d Cir.1984) (the "First Amendment embraces a right of access to civil trials to ensure that this constitutionally protected discussion of governmental affairs is an informed one").

3. The First Amendment **interdicts restraints on freedom of the press imposed by the courts.** *New York Times Co. v. United States,* 403 U.S.

free flow may be disturbed by the judiciary solely for the protection of its decisional process, its integrity and its impartiality.[4]

¶ 5 The burden is always cast on the party seeking the sealing of information to show that public access to its content would harm not just a party but the integrity, neutrality and detachment of the judicial service. **That is the essence of the constitutional protection against sealing which is afforded by the First Amendment's free-speech-and-press guarantee.**

¶ 6 Were we today to accept all facts tendered below as true, there would still be no evidence before us to indicate clear and present danger exists to the neutrality or integrity of the judicial fact-finding process from the public access to the material ordered to be withheld by the trial court's sealing.[5]

¶ 7 Was the trial court's sealing of a polygraph test result a correct legal response? I would answer this question, as the court does today, in the negative. **This is so because the test results are facially inadmissible as evidence.**[6]

¶ 8 The question deals with the extent of judicial power to keep the air clean from contamination of public perception in advance of the trial. The defendants invoked judicial power in an effort to prevent perceived potential contamination from public reach by the use of sealing. Since we are dealing with material not fit for admission as evidence, the defendants pressed judicial power beyond its legal reach. **Courts have neither the power nor the duty to sanitize community climate of potential contaminants which cannot reach the status of evidence at trial.**[7]

¶ 9 Pushing forward judicial sealing authority to include facially inadmissible evidence would extend the power of courts over the control of material that cannot and will not make its way inside a judicial forum. If

---

713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971); *Craig v. Harney,* 331 U.S. 367, 373, 67 S.Ct. 1249, 1253, 91 L.Ed. 1546 (1947); *Bridges v. California,* 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192 (1941). "The history of the power to punish for contempt ... and the **unequivocal command of the First Amendment** serve as constant reminders that **freedom of speech and of the press** should not be impaired through the exercise of that power, unless there is no doubt that the utterances in **question are a serious and imminent threat to the administration of justice."** *Craig v. Harney, supra.*

4. *Craig v. Harney, supra* note 3.

5. "The question in every case is whether the words used are used in such circumstances and are of such a nature as to create a clear and present danger that they will bring about the substantive evils that Congress has a right to prevent." *F.C.C. v. Pacifica Foundation,* 438 U.S. 726, 744–45, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978)(*quoting Justice Holmes' formulation in Schenck v. United States,* 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919). "To justify suppression of free speech there must be reasonable ground to fear that serious evil will result if free speech is practiced. There must be reasonable ground to believe that the danger apprehended is imminent." *Whitney v. California,* 274 U.S. 357, 376, 47 S.Ct. 641, 648, 71 L.Ed. 1095 (1927)(Brandeis, J., concurring). **The substantive evil against which the law may protect here is interference with the orderly administration of judicial process and impartial adjudication.**

6. Polygraph test results are not admissible in criminal trials for any purpose. *Paxton v. State,*

1993 OK CR 59, ¶ 42, 867 P.2d 1309; *State v. Cook,* 1978 OK CR 15, ¶ 2, 574 P.2d 1073. In a slander lawsuit, the reference to a polygraph test was deemed harmless error. *Hames v. Anderson,* 1977 OK 191, 571 P.2d 831; *but cf. Conti v. Republic Underwriters Ins. Co.,* 1989 OK 128, 782 P.2d 1357.

7. *But cf. In re Reporters Comm. for Freedom of the Press,* 773 F.2d 1325, 1338 (D.C.Cir.1985) (the **admission of evidence** is the touchstone of the First Amendment right of access **because discovered, but not yet admitted, information was not traditionally open to the public);** *United States v. Amodeo,* 44 F.3d 141, 145 (2d Cir.1995); *United States v. Amodeo,* 71 F.3d 1044 (2d Cir. 1995) (the **mere filing of a document is insufficient to make it subject to the right of public access;** the court must actually rely on that document in the course of performing its judicial functions).

The First Amendment right of access extends to documents submitted **in connection with a judicial proceeding.** (*United States v. Peters,* 754 F.2d 753, 763) (7th Cir.1985); *In re Continental Ill. Sec. Litig.,* 732 F.2d 1302, 1308–10 (7th Cir. 1984); *Publicker Industries, Inc. v. Cohen, supra* note 2, 733 F.2d at 1070. The First Amendment right of access does not attach to all aspects of a criminal trial, including, for example, presentence reports, withdrawn plea agreements or affidavits supporting search warrants. *See United States v. Corbitt,* 879 F.2d 224, 228 (7th Cir. 1989); *United States v. El-Sayegh,* 131 F.3d 158, 161 (D.C.Cir.1997); *Baltimore Sun Co. v. Goetz,* 886 F.2d 60, 64–65 (4th Cir.1989).

the power sought to be exercised were available, the judiciary would be under a duty not only to keep the trial process clean of contaminants, but worse yet, it would be required to remove from the reach of the public all floating information whose dissemination must remain beyond its constitutional reach. We need not deal in this case with the general legal propriety of sealing because none of the sealed polygraph test results could ever be evidence in the case at hand and their removal from the eye and ear of the public must be regarded as clearly unwarranted.

¶ 10 While the release of polygraph test results might have some adverse impact on the outcome of pending criminal charges against the defendants, that alone does not justify the sealing in this case. To protect the defendants against a serious threat to the fairness of a criminal trial, Oklahoma law provides for a change of venue [8] and for several other less drastic measures than sealing documents that cannot be used in the trial process to be protected.

¶ 11 In sum, material that is incapable of being used as proof in the case must be regarded as present exterior to the court-controlled environment and hence beyond the court's pretrial power to suppress. Exterior contaminants, if indeed worthy of immediate notice because of their potential for influencing jurors or for otherwise affecting their verdict, must be dealt with by means other than sealing. **In the absence of proof that there is a clear and present danger from threatened institutional contamination of the contemplated judicial decision-making process,** there was here no apparent need for court intervention. Moreover, none could ever be perceived when the basic facts are tested by the command of the free-speech and free-press clauses of the First Amendment to the U.S. Constitution. The trial judge's sealing order is correctly reversed as an impermissible judicial interference with a constitutionally protected public freedom of utmost societal importance.