2014 OK 21

**STATE of Oklahoma ex rel. OKLAHOMA BAR ASSOCIATION, Complainant,**

v.

**Jennifer Adina LAYTON, Respondent.**

**SCBD No. 6018.**

Supreme Court of Oklahoma.

March 25, 2014.

Gina Lynn Hendryx, Katherine M. Ogden, Oklahoma City, Oklahoma, for Oklahoma Bar Association.

John Northcutt, John Wesley Raley, Ponca City, Oklahoma, for Respondent.

KAUGER, J.

¶ 1 The Bar Association alleged that Jennifer Layton (respondent): 1) neglected to disclose to the court and opposing counsel that her witness was going to testify inconsistently with his previous police statement; and 2) falsely denied that she had spoken to the

witness before and/or during the trial. It contends that her conduct violated Rules 3.3 [falsifying evidence/foiling to disclose evidence to tribunal],[2] 3.8[special responsibilities of a prosecutor],[3] and 8.4 [4] [professional misconduct] of the Rules of Professional Conduct, 5 O.S.2011 Ch.1, App. 3–A, and Rule 1.3 [discredit to the profession] [5] of the Rules Governing Disciplinary Proceedings 5 O.S. 2011 Ch. 1, App. 1–A. The Bar Association seeks "some length" of suspension. The respondent argues that she should not be disciplined given the circumstances surrounding the alleged events, the miscommunica-tion/misunderstanding with the trial judge, and her lack of intent or any ulterior motives in making an inadvertent mistake.

¶2 We determine that the cumulative circumstances show that trial court's failure to create a transcribed record of bench conferences and chamber conferences in this serious first degree rape trial, coupled with the complaining defense attorney's in-court behavior, and the contemporaneous testimony of the respondent, reflect the nature of the proceedings. Under the facts presented, the respondent's violation of the rules does not

2. Rule 3.3 of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A provides:
   (a) A lawyer shall not knowingly:
   (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;
   (2) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel; or
   (3) offer evidence that the lawyer knows to be false. If a lawyer, the lawyer's client, or a witness called by the lawyer, has offered material evidence and the lawyer comes to know of its falsity, the lawyer shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal. A lawyer may refuse to offer evidence that the lawyer reasonably believes is false.
   (4) fail to disclose a fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by the client.
   (b) A lawyer who represents a client in an adjudicative proceeding and who knows that a person intends to engage, is engaging or has engaged in criminal or fraudulent conduct related to the proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.
   (c) The duties stated in paragraphs (a) and (b) continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by Rule 1.6.
   (d) In an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer which will enable the tribunal to make an informed decision, whether or not the facts are adverse. ·

3. Rule 3.8(d) of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A provides in pertinent:
   The prosecutor in a criminal case shall:
   . . . (d) make timely disclosure to the defense of all evidence or information known to the pros-ecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; . . .

4. Rule 8.4 of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A provides:
   It is professional misconduct for a lawyer to:
   (a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
   (b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;
   (c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;
   (d) engage in conduct that is prejudicial to the administration of justice;
   (e) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Rules of Professional Conduct or other law; or
   (f) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

5. Rule 1.3 of the Rules Governing Disciplinary Proceedings, 5 O.S.2011 Ch. 1, App. 1–A provides:
   The commission by any lawyer of any act contrary to prescribed standards of conduct, whether in the course of his professional capacity, or otherwise, which act would reasonably be found to bring discredit upon the legal profession, shall be grounds for disciplinary action, whether or not the act is a felony or misdemeanor, or a crime at all. Conviction in a criminal proceeding is not a condition precedent to the imposition of discipline.

require the imposition of discipline. The bar disciplinary proceeding is dismissed, the respondent is exonerated of the charges, and the application to assess costs is denied.

## FACTS

¶3 The Bar Association's grievance against the respondent stems from a felony criminal rape trial held May 23–24, 2012, in Kay County district court. The respondent served as the prosecutor. Three different lawyers represented the three men who were on trial in consolidated cases for conspiracy, first degree rape, first degree rape by instrumentation, forcible sodomy and kidnaping.

¶4 Antral Miller was a witness for the prosecution. In a police report which was provided to defense counsel,[6] Miller stated that at approximately 4 or 5 a.m. on the morning of the alleged rape, the victim came to his house, let herself in through the unlocked back door, and awakened him. She was crying and she told him that she had been raped at a nearby house. Milter stated that "she did not tell me who raped her. She did not tell me who had done it." Miller was friends with the defendants and also happened to be a cousin of one of the defendants. The victim had always maintained that she knew that the three defendants had raped her and that she told this to Miller. Identity of the defendants was not an issue in the case, nor a surprise. Respondent had stated to the defense that Miller would testify consistent with reports previously provided to them.

¶5 Neither the respondent nor any of the defense counsel had an opportunity to discuss the case with Miller before the first day of trial Miller actively avoided subpoenas and was not a cooperating witness on anyone's behalf Even though the State unsuccessfully attempted to contact Miller on several occasions, he was only served in time to show up on the morning of the first day of trial The respondent saw Miller in the witness room where he told her that he did not want to be there and that he needed to leave because of his job. She informed him that he would not be needed that day, but that he had better show up the next day because he was still under subpoena.

¶6 The next day, Miller again reluctantly appeared at the trial to testify. Layton talked to Miller for about 90 seconds before she went into the courtroom while he was on the phone with his boss explaining his absence from work. Later that day, during a lunch break, Layton spoke with Miller for about 30 seconds, asking him about other people who were at the party. In one of these conversations, Layton admits that when she was walking away she heard Miller mumble something like "I can't believe Cuz, Kat and Soul raped her," but she did not think anything about it because the identity of the alleged attackers was not an issue in the case. The respondent did not disclose to any defense counsel that she had talked to Miller at all before he testified.[7] When Miller did take the stand, after the lunch break, he testified that the victim told him "they raped me. Your cousin, Kerry and Kat raped me." Miller firmer explained that these were the nicknames of the defendants.

¶7 Miller's statements came as a surprise to defense counsel because they were inconsistent with his prior police report wherein he stated that the victim did not tell him the names of her alleged attackers. Accordingly, all three defense counsel objected on the

---

6.  The written witness and exhibit list was provided by the respondent in compliance with the Oklahoma Discovery Code, 22 O.S.2011 § 2002 which provides in pertinent part:

    A.  Disclosure of Evidence by the State.
    1.  Upon request of the defense, the state shall be required to disclose the following:
    a.  the names and addresses of witnesses which the state intends to call at trial, together with their relevant, written or recorded state-

ment, if any, or if none, significant summaries of any oral statement,
    b.  law enforcement reports made in connection with the particular case, ...

7.  Rule 3.8(d) of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A, see note 2, supra, requires prosecutors to make timely disclosures to the defense of all known evidence or information that may negate or mitigate the guilt of the accused.

grounds that Miller's testimony had not been disclosed to them prior to trial.[8] They, along with the judge, and the respondent, discussed the matter at the bench.

¶ 8 Even though this was a serious felony criminal trial, the trial judge, apparently continuing his usual practice, chose not to include bench conferences on the official record.[9] Consequently, there is no transcript of the conversation which occurred between the judge and lawyers. Later in the day, after the jury was excused, the trial judge went on the record and restated what happened during the conversation at the bench. He stated that the statement at the bench was made "to be fair to the State, was that the State had not met with this witness prior to trial" and that the "State did not anticipate that he would testify in the manner he testified today."

¶ 9 The trial judge also found no lack of compliance of discovery on the State's part. According to the defense counsel, when the judge asked Layton if she had "spoken" to Miller before trial, she said that she had not "spoken" to him about his testimony prior to trial Consequently, the judge overruled the defense counsel's objections. The trial judge did allow the lawyers to add their own comments of "their own recollection of the bench conferences" if he were incorrect.

¶ 10 Layton continued direct examination of Miller, asking Miller to describe what happened on the night of the rape. She also asked if a man nicknamed "June Bug" had anything in his hand. Miller responded that June Bug was very intoxicated and was carrying a bottle of tequila. This line of questioning drew another objection which was overruled because Layton again denied speaking with Miller prior to trial.

¶ 11 On cross examination, Miller testified that he had not talked with anyone in the District Attorney's office about his testimony

and that he "just came yesterday for court, and today." Layton did not correct this inaccurate technicality, nor did she do so at the end of the day's court proceedings when the judge was summarizing the objections for the record. Rather, she allowed the court to believe that she had never discussed anything with Miller at all, when in fact she had "spoken" to him very briefly while she prepared to start the trial and during the chaos which was occurring with the arrival of the victim, witnesses, and the victim's family members.

¶ 12 One of the defense counsel expressed concern that Layton could not have possibly known to ask Miller about what someone had in their hand unless she had spoken with him prior to his testimony. The judge instructed all counsel to convene in his chambers first thing the next morning. What happened in the judge's chambers was again not recorded or transcribed, leaving this Court with little to review. By everyone's account it was tense, confrontational, but, and emotional. Apparently the judge yelled at Layton, asking if she had "spoken" to Miller prior to trial? Her testimony was that rather than let her explain or expand on what she said, he merely kept accusing her of lying to him in court and demanded she "fell on her sword."

¶ 13 What is not clear, is what was actually said in this conference because there were slight variations in each person's descriptions of what occurred in chambers. Of course, the Judge and lawyers were having to recall what had happened during a trial that had occurred over 18 months earlier. The defense counsel now seemed to "understand" that Layton admitted that she did in fact know Miller was going to testify that the victim had identified the three defendants. Layton insists that she never knew that he was going to change his testimony.

¶ 14 She also insists that she misunderstood the trial judge when he asked her if

---

8. Not only does Rule 3.8(d) of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A, see note 3, supra, require disclosure, but the Oklahoma Discovery Code, 22 O.S.2001 § 2002, see note 6, supra, also requires it.

9. Transcript of PRT hearing, August 22, 2013, pp. 239–40.

she had "spoken" to Miller. She interpreted this to mean, had she spoken to him "about his testimony," or have any kind of meaningful witness preparation with him—neither of which occurred. She maintains she never knew Miller was going to change his testimony. Layton said that the judge just yelled at her and would not allow her to explain anything, but instead called her a Bar and kept insisting she "fell on her sword." What is apparent was that the trial judge's primary concern was that she call herself a "liar" to him. Apparently, the trial court and the respondent were never on the same wave length.

¶ 15 Regardless of whether Layton knew what Miller was going to say on the stand, the trial court was convinced that she had lied about having ever "spoken" to him at trial at all and that she did not point out that Miller was lying when he said he hadn't spoken to the District Attorney's office before trial His effort to "fix" the matter was to instruct the jury that Miller had given false testimony when he stated that he did not speak with anyone from the District Attorney's office and that the jury could consider that tact in their deliberations. The instruction offered no further information as to exactly what the communication was or when it occurred.

¶ 16 During the trial, defense attorney Loftis demanded that the matter be referred to the Oklahoma Bar Association based on the respondent's failure to give the defense counsel notice as to Miller's change in testimony. Layton's response is long, but necessary because it was transcribed on the record, during the trial It literally sets the stage for how the events unfolded that day. The transcript of the proceedings of May 24, 2012, pp. 16–22 provides:

MS. LAYTON: First of all, so much about what happened yesterday has been misconstrued. What happened is—first of all, I want to at least paint somewhat of a picture of what is going on in my world during these trials, compared to what is happening here.

The Victim Witness Center is jam-packed with people at all times. Antral Miller has not been available to the State because he is the cousin of one of the defendants and the good friend of the other defendant. He has been completely available to the defendants for a year and-a-half We have not been able to interview him, law enforcement has not, nor has any employee of the District Attorney's Office, despite numerous phone calls and attempts to talk to him for a year and-a-half, because he is related to the defendants and good friends of theirs.

THE COURT: Let me stop you a minute.

MS. LAYTON: Please don't, Your Honor. Please let me finish.

THE COURT: No, because you made a statement I want to follow up on. Has any law enforcement official or employee of the District Attorney's Office contacted Mr. Miller and he refused to talk to them?

MS. LAYTON: No. We have attempted to contact him, left messages on cell phones, talked to people around him and told him we wanted to talk to him, and he has not returned calls and would not speak to anybody. People have gone to his home to attempt to serve him subpoenas and he is never there. We cannot contact him. The only way we finally did serve him is there was a fire and a fireman, who is also a reserve deputy, kept him there, made a phone call and got him served and he was not happy. But he was told at that time if he did not honor that subpoena, he could be arrested. That is the only reason he showed up, and his uncle brought him to make sure he didn't get arrested. So he did appear under subpoena Tuesday morning.

At the same time when I'm trying to prepare a victim to testify on the most horrible day of her life, I've got her family in there, who are not easy to deal with, quite frankly. I've got Mr. Loftis's assistant calling her a slut all the way through the courthouse. I'm trying to deal with that and deputies talking to me about that.

And meanwhile, Mr. Goodman tells me he needs my officer for a prelim at the same time. I've got other people in there, I don't even know who they are. All of this is happening at the same time.

Meanwhile, Antral Miller walks in. I'm actually shocked he shows up, but he does. I have approximately two minutes to spend with him before he testifies later in the day. I tell them: Do not let this man leave; I'm going to need him later in the day.

He's on the phone when I even see him.

I get to spend a couple of minutes with him while he is literally on the phone with his employer. At the same time, he's complaining: I'm supposed to be at work. I don't want to testify. I told you I don't want to testify. I don't want to be here. I'm going to be a snitch. They're going to hurt me. I don't want to testify.

And I'm trying to deal with him like a mother: You have to testify, you've got to tell the truth, you—you said you'd tell the truth, that's what you're—you know, I'm dealing with this.

So he's on the phone with his employer and I say to him: You gave a statement to the police. Are you going to testify truthfully to what you told the police? And he says: Yes.

I'm literally trying to get out the door as Ed Goodman is knocking on the door telling me he needs my case officer, and I turn to him and say—because I remember that the Defense keeps harping on this Lee Coburn that's going to testify that he sees consensual sex—so I say to him: Is Lee—do you remember seeing Lee Coburn at this party—cause I don't think there's any reason why I can't ask my witnesses for a few extra details when they testify, just like everybody else does—and I say: Did you see Lee Coburn at this party? And he's, like: Yeah, he's drunk and unconscious the whole time, cause he's been carrying around a fifth of something.

I don't know much about liquor, I don't know what he said.

So I'm, like, oh, well that's kind of interesting. If he's drunk, unconscious the whole time, how is he seeing everything they're saying he is seeing?

Interestingly enough, Your Honor, that's not what he testified an hour later on the stand. So had I provided an updated witness exhibit list that had his summary of testimony, it wouldn't have even been accurate. That's one of the things that makes this so difficult with this script that they're expecting me to provide. Had I provided that, that wouldn't have been accurate, anyway, because he didn't testify the same an hour later about Lee Coburn when I asked him about how much he'd had to drink and being unconscious, lying around through the whole party. He didn't say that. What his testimony was, was more helpful to them about Lee Coburn.

Then, I said: And you're going to testify—

THE REPORTER: You need to slow down Ms. Layton. I'm sorry.

MS. LAYTON: Then as—again, he's on the phone, literally, with his employer and barely talking to me and I'm standing there, spending about two minutes with him. I say to him: And you're going to testify honestly that Alicia Southern came to you crying for help, and I understand you couldn't help her—I'm trying not to make him feel guilty or bad—but she came and told you this happened to her?

And he says, kind of shaking his head: I can't believe Cuz, Kat and Soul did that to her, but I—I'm going to tell the truth.

And that's when he mumbled that statement. And at that time, Your Honor, it never occurred to me he had never said that before. I have read preliminary hearing transcripts, I've listened to seven disks full of interviews in the last week. I have read statements after statements. I don't have every single one memorized word-for-word. It never occurred to me at that moment that I needed to run, retype an exhibit/witness list for these Defense attor-

neys. I left at that moment, thinking, thank God he's going to testify. That never occurred to me.

Then he's testifying, boom the objection occurs, we come up to the bench for the hundredth time in this trial and they're—they're yelling they don't know that information You asked me—and they bring up my witness list and say: This isn't in the witness list, it says consistent with the reports.

And I say: I never got to interview this witness. We couldn't find him We couldn't subpoena him till the last minute. And I say: I never got to interview this witness. We couldn't find him We couldn't subpoena him till the last minute.

I think I even mentioned the fire. Ms. Ramsey even has the list in her hand.

And you say: Did you know he was going to testify to that? Could you have given notice?

And I said: Your Honor, I never saw that man until today, until he was subpoenaed to come here to testify. I didn't know he was going to say that.

I would—we were talking about notice. I never intended to lie to the Court. I literally knew that in a split second as I'm walking out the door. I remember hearing him mumble: Cat whatever those nicknames are. I've heard so many nicknames in this case and street names and all that. I did remember him mumbling that. So when we went back in chambers and you asked me: Did you know that? It clicked that, yes, I did know that a few minutes or hours, whatever, before he testified. So I wasn't going to stand in your—in your chambers and say: No, I had never heard that information before.

I answered those questions. If I had created this to some great conspiracy to lie, I could have simply stood in your

chambers and said: No, never heard that, Your Honor, I just thought about the bottle because of liquor. I could have continued that. I never intended to mislead or lie. When we were at the bench, we were talking about notice issues.

¶ 17 The jury acquitted the defendants of all the charges. Two months later, one of the three defense attorneys, Scott Loftis, filed a bar complaint alleging that Layton violated the Rules of Professional Conduct by lying to the court. The other two defense attorneys would not join in filing the complaint, but they did provide their affidavits concerning their versions of what occurred at the trial Loftis prepared an affidavit for one of them to sign, but he felt two paragraphs of it were opinion-based that Loftis wanted him to say he believed Layton had committed some violation, but he was unwilling to do that.

¶ 18 After investigating the matter, the Bar Association filed a complaint with this Court on May 23, 2013, alleging that the respondent engaged in one count of misconduct in violation of Rules 3.3, 3.8, and 8.4 of the Rules of Professional Conduct and Rule 1.3 of the Rules Governing Disciplinary Proceedings [10] when she foiled to advise the trial court and the defense counsel that she had briefly talked to the witness while he was at the courthouse for the trial Layton answered, denying any wrongdoing. She explained in a letter to the Bar Association:

> When [the judge] Boyd asked me that question, at 4:15 p.m. on the second day of trial, I thought he was asking me if I had talked to the witness about his testimony and knew he was going to testify differently than what he had told Detective Sherron. When I told him no, I believed 100% that I was giving him an honest answer. I never intended to lie to the court or anyone else. I think it is also important to note that the witness testified under oath to the exact same thing ·when the defense

---

**10.** Rule 3.3 of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A, see note 2, supra; Rule 3.8 of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A, see note 3, supra; Rule 8.4 of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A, see note 4, supra.

attorneys asked him the same question when he was testifying. Neither one of us felt like our brief encounters that day constituted 'speaking with the district attorney's office about your testimony.'

■ ¶ 19 The PRT held a hearing on August 22 and September 17, 2013. Several additional facts were revealed at the hearing which were not reflected in the partial jury trial transcripts which were submitted with the record. In addition to the above facts, the hearing testimony also revealed the personal bias of Loftis against both Layton and her employer. The respondent and Loftis agree that they never got along or liked each other. Lofits called the respondent either a "f—ing idiot" or "f—ing bitch" [two different accounts were given by witnesses, both agreed he used the word "f—ing"] in open court and in the presence of print media journalists without any apparent rebuke from any of the other attorneys or the trial court. In fact, he blatantly turned to the press and told them they could quote him No one seemed concerned that Loftis may have violated the Rules of Professional Conduct by this in court outburst or by letting his staff harass the victim by calling her a slut.[11] However, this oversight may resolve itself because the disciplinary proceeding hearing ended on September 17, 2013, the PRT report was filed on November 12, 2013, and on November 21, 2013, Loftis was charged with multiple febnies in Kay County, including subordination of perjury, false preparation of exhibits as evidence, and conspiracy to bring contraband into a penal institute.[12]

**11.** Although this Court does not bring disciplinary proceedings, we are the arbiter of discipline. The Preamble to the Rules of Professional Conduct, 5 O.S.2011 Ch. 1, App. 3–A provides: in pertinent part:

■ A lawyer's conduct should conform to the requirements of the law, both in professional service to clients and in the lawyer's business and personal affairs. A lawyer should use the law's procedures only for legitimate purposes and not to harass or intimidate others. A lawyer should demonstrate respect for the legal system and for those who serve it, including judges, other lawyers and public officials. While it is a lawyer's duty, when necessary, to challenge the rectitude of official action, it is also a lawyer's duty to uphold legal process. Rule 8.4 of the Rules of Professional Conduct, 5 O.S.2011 Ch. 1, App. 3–A provides in pertinent part:

It is professional misconduct for a lawyer to:
(a) violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another; . . .
(d) engage in conduct that is prejudicial to the administration of justice; . . .

Rule 3.5 of the Rules of Professional Conduct, 5 O.S.2011 Ch. 1, App. 3–A provides:

A lawyer shall not:
. . . (d) engage in conduct intended to disrupt a tribunal. . . .

Rule 5.3 of the Rules of Professional Conduct, 5 O.S.2011 Ch. 1, App. 3–A provides:

With respect to a non lawyer employed or retained by or associated with a lawyer:
(a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;
(b) a lawyer having direct supervisory authority over the non lawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; and
(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Rules of Professional Conduct if engaged in by a lawyer if:
(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or
(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action.

Rule 1.3 of the Rules Governing Disciplinary Proceedings, see note 5, supra; Rule 1.5 of the Rules Governing Disciplinary Proceedings, 5 O.S.2011 Ch. 1, App. 1–A provides:

This Court has adopted the Oklahoma Rules of Professional Conduct, adopted by American Bar Association, acting through its House of Delegates on August 2, 1983, and adopted by the House of Delegates of the Oklahoma Bar Association on November 21, 1986, as subsequently modified by this Court, and as it may hereafter be modified by this Court, as the standard of professional conduct of all lawyers. Any lawyer violating these Rules of Professional Conduct shall be subject to discipline, as herein provided.

**12.** According to the Kay County Docket, Criminal Felony charges were filed against Loftis on November 21, 2013. This Court takes judicial

¶ 20 Loftis publicly opposed the election of the District Attorney, calling him a miserable failure to the citizens of Kay and Noble Counties. He also planned on seeking to replace the DA in 2014.[13] The respondent, on the other hand, according to witnesses, prior to this case, had a reputation for honesty, candor, integrity and professionalism They testified her alleged actions in this trial were not consistent with her reputation or her work history as a practicing attorney. A judge who testified on her behalf said:

> Based on my number of cases I've had with Ms. Layton, the professional relationship that I've had with her, other members of our Bar throughout, I cannot in my wildest imagination believe that she intentionally would mislead the Court.[14]

Another Judge said:

> I would not imagine that what I know of Ms. Layton, that she would be the type of person who would deliberately mislead the Court or mislead counsel for the opposing party, either one.[15]

A third judge wrote in a letter to the Bar Association that:

I do not wish to interfere with the Bar Association's process in the investigation of the complaint I write only to lift Jennifer up as a valuable, ethical, and moral member of our focal bar.[16]

Nor were her actions planned, schemed or premeditated to subvert justice. Rather, they occurred in the spur of the moment, in the heat of a vigorously contested rape trial

¶ 21 After serving eight years in the DA office, Layton left, and she is now in private practice. Apparently, the trial judge is still waiting for his apology.[17] Layton also stated that the investigator for the Bar Association told her she needed to file a written reply and that she had better show remorse and tell the Bar Association that she had learned her lesson and phrase it as best she could or they would go harsher on her. The investigator denies this. Nevertheless, when the lawyer stood her ground, this cause was vigorously pursued to this Court.

¶ 22 On November 12, 2013, the PRT determined that the Bar Association neglected to prove by clear and convincing evidence any violation of 3.8 of the Rules of Profes-

---

notice of the Dockets of District and Appellate Courts. *Collier v. Reese,* 2009 OK 86, ¶.8, fn. 7, 223 P.3d 966. *See State ex rel. Oklahoma State Board of Examiners of Certified Shorthand Reporters v. Parrish,* 2006 OK 91, ¶ 7 fn. 1, 152 P.3d 202; *Mehdipour v. State ex rel. Department of Corrections,* 2004 OK 19, ¶ 7 fn. 15, 90 P.3d 546; *Myers v. Lashley,* 2002 OK 14, ¶ 5, fn. 8, 44 P.3d 553. If convicted, Loftis feces suspension from the practice of law. Rule 7.1 Rules Governing Disciplinary Proceeding, 5 O.S.2011 Ch. 1, App. 1–A provides:

> A lawyer who has been convicted or has tendered a plea of guilty or nolo contendere pursuant to a deferred sentence plea agreement in any jurisdiction of a crime which demonstrates such lawyer's unfitness to practice law, regardless of whether the conviction resulted from a plea of guilty or nolo contendere or from a verdict after trial, shall be subject to discipline as herein provided, regardless of the pendency of an appeal.

13.  The PRT transcript of August 22, 2013 p. 210 provides:
> A. I haven't formally filed with the county but there's been, obviously, a statement in the Ponca City newspaper that I—my intention is to seek that office in 2014.

14.  PRT hearing of August 22, 2013, p. 323.

15.  PRT hearing of August 22, 2013, p. 335

16.  Respondent's exhibit 2.

17.  The transcript of the PRT proceeding dated August 22, 2013, m p. 259, the trial judge discusses a meeting with Layton several weeks or longer, after the trial in which he states:
> I absolutely hate that this occurred. I don't want to be here, I don't want her to be here. It's just very painful all the way around. But there was no acceptance of responsibility for it and no apology to the Court.

On September 17, 2013, p. 539 of the PRT proceeding, Layton testified regarding subsequent conversations with the trial judge:
> I don't know if that's his exact words, but that was the theme of that summer, was he—he just—every time that I talked to him about it which was just a couple of times, he didn't use those exact words. He said things like, 'Throw yourself on your sword. Show remorse. Apologize to me for lying,' things like that.

sional Conduct concerning the special responsibility of a prosecutor to disclose to the defense all mitigation information known to the prosecutor.[18] It acknowledges, and we agree, that the clear and convincing evidence did not show that: 1) Layton knew Miller would testify as he did; and 2) that such testimony would exculpate, mitigate, or negate guilt and should have been disclosed. It did find that she violated Rules 3.3 and 8.4 of the Rules of Professional Conduct.[19] In other words, the PRT agrees that Layton did not know Miller was going to change his testimony, but she lied to the trial judge when she denied speaking with him prior to trial It recommended that Layton be publicly censured and that she pay the costs of the investigation in this matter.

¶ 23 Regardless of the PRTs findings, the Bar Association argues that the clear and convincing evidence demonstrated that the respondent did violate Rules 3.3, 3.8, and 8.4 of the Rules of Professional Conduct and Rule 1.3 of the Rules Governing Disciplinary Proceedings.[20] It seeks some type of suspension rather than a public censure. On November 12, 2013, the Bar Association filed an application to assess costs against the respondent for the amount of $6,438.71. On February 11, 2014, the Bar Association amended its application for costs to exclude reimbursement of lunch expenditures. The amended amount is $6,273.71.

¶ 24 THE CUMULATIVE CIRCUMSTANCES SHOW THAT THE TRIAL COURT'S NEGLECT IN CREATING A TRANSCRIBED RECORD OF BENCH CONFERENCES AND CHAMBER CONFERENCES IN THIS SERIOUS FIRST DEGREE RAPE TRIAL, COUPLED WITH THE COMPLAINING DEFENSE ATTORNEYS IN COURT BEHAVIOR, AND THE CONTEMPORANEOUS TESTIMONY OF THE RESPONDENT, REFLECT THE NATURE OF THE PROCEEDINGS. UNDER THE FACTS PRESENTED, THE RESPONDENT'S VIOLATION OF THE RULES DOES NOT REQUIRE THE IMPOSITION OF DISCIPLINE.

¶ 25 In disciplinary matters, this Court possesses exclusive original jurisdiction.[21] We are not bound by agreed findings, conclusions of law, or recommendations for discipline.[22] Rather, the ultimate responsibility for imposition of professional discipline is ours alone. The Court's review is de novo in considering the record presented as well as the recommendations for discipline.[23] Before we may impose discipline upon an attorney, the charges must be established by clear and convincing evidence.[24]

¶ 26 Undeniably, Rules 3.3, and 8.4 of the

18. Rule 3.8(d) of the Rules of Professional Conduct, Title 5 O.S.2001 Ch. 1, App. 3–A, see note 3, supra; Rule 3.3 of the Rules of Professional Conduct, Title 5 O.S.2001 Ch. 1, App. 3–A, see note 2, supra.

19. Rule 3.3 of the Rules of Professional Conduct, Title 5 O.S.2011 Ch. 1, App. 3–A, see note 2, supra; Rule 8.4 of the Rules of Professional Conduct, Title 5 O.S.2011 Ch 1, App. 3–A, see note 4, supra.

20. Rule 1.1 of the Rules of Professional Conduct, 5 O.S.2001 Ch 1, App. 3–A; Rule 3.3 of the Rules of Professional Conduct, Title 5 O.S.2001 Ch. 1, App. 3–A, see note 2, supra.

21. Rule 1.1, Rules Governing Disciplinary Proceedings, 5 O.S.2001, Ch 1, App. 1–A; State ex rel. Oklahoma Bar Ass'n v. Holden, 1995 OK 25, ¶ 1, 895 P.2d 707; State ex rel. Oklahoma Bar Ass'n v. McMillian, 1989 OK 16, ¶ 5, 770 P.2d 892.

22. State ex rel. Oklahoma Bar Ass'n v. Erickson, 2001 OK 66, ¶ 14, 29 P.3d 550; State ex rel. Oklahoma Bar Ass'n v. Israel, 2001 OK 42, ¶ 13, 25 P.3d 909.

23. State ex rel. Oklahoma Bar Ass'n v. Israel, see note 14, supra; State ex rel. Oklahoma Bar Ass'n v. Bolusky, 2001 OK 26, ¶ 7, 23 P.3d 268; State ex rel. Oklahoma Bar Ass'n v. Dershem, 2001 OK 7, ¶ 12, 21 P.3d 639.

24. Rule 6.12, Rules Governing Disciplinary Proceeding, 5 O.S.2011, Ch 1, App. 1–A provides:

(a) So far as practicable, the disciplinary proceedings and the reception of evidence shall be governed generally by the rules in civil proceedings, except as otherwise herein provided; the respondent shall be entitled to be represented by counsel

(b) On a charge of solicitation of professional employment through a lay person or agency, it shall not be necessary to prove that such lay person or agency received compensation.

Rules of Professional Conduct [25] require candor and honesty to the trial court and violating such rules would certainly bring discredit to the profession.[26] The record is clear that Layton was not clearly candid to the trial court that she spoke with Miller before his testimony, or what was discussed. To illustrate the violation of the Rules, and to respond to the respondent's argument that she did not intend to deceive the judge, the Bar Association relies on *State ex rel. Okla. Bar Ass'n v. Krug*, 2004 OK 28, ¶ 12, 92 P.3d 67 and *State ex rel. Oklahoma Bar Ass'n v. Johnston*, 1993 OK 91, 863 P.2d 1136.

¶ 27 In *Johnston*, supra, an attorney was accused of commingling and converting funds and making false statements to the court. The record did not show that the attorney had any improper motive. The Court noted that a violation of the Rules does not require any proof of "bad or evil intent." In *Krug*, supra, the attorney was alleged to have made a false statement to a tribunal by attaching an order of a fee request which did not conform to the judge's actual order. It was shown that she did not realize the copy was non-conforming until the judge pointed it out to her. The PRT relied on *Johnston*, supra, to find that a violation of the rules occurred regardless of whether the attorney intended to deceive the judge. We said in *Krug*, supra:

¶ 11 *Johnston* does not go as far as the PRT suggests. Although *Johnston* does say a 'false statement to a tribunal ... requires no proof of bad or evil intent, nor must it be material,' *id.* at 1143, it does not do away with ORPC Rule 3.3(a)'s requirement that the alleged act be done knowingly. In fact, the case cited by *Johnston* makes this clear. The cited case, *OBA v. McMillian*, 1989 OK 16, 770 P.2d 892,

expressly reaffirms the requirement that the alleged act be done knowingly: 'As long as the lawyer has *actual knowledge* of a false statement of fact or law, no inquiry need be made as to his [or her] motivation for making the false statement to show a rule violation' *McMillian*, 770 P.2d at 899 (emphasis added).

¶ 12 For purposes of ORPC Rule 3.3(a), knowingly means 'actual knowledge of the fact in question. A person's knowledge may be inferred from circumstances.' 5 O.S.2001, Ch. 1, App. 3–A (Terminology). Thus, to prevail on Count I of its Complaint in this matter, the OBA must prove more than the fact that Respondent physically 'attached' (i.e., stapled) a copy of the non-conformed order to her fee application. Rather, the OBA must prove Respondent had actual knowledge she was making a false statement of fact to Judge Croy, Le., that the order she attached to her fee application was a non-conformed copy of the original.

¶ 13 Despite the PRTs conclusion that Respondent violated ORPC Rule 3.3(a), it acknowledged in its Report: 'It is not certain whether [Respondent's] use of the erroneous order in her fee application was intentional or an oversight' In other words, the panel itself questioned whether the Respondent's conduct was done with actual knowledge. Our de novo review of the evidence leads us to the same question.

¶ 28 While intent may be irrelevant, actual knowledge of the falsity is relevant. Here, if the respondent had misunderstood what the trial judge was asking, her "actual knowledge" was based on a mistake and *Johnston*, supra, and *Krug*, supra do not control The trial court did not have either the bench conference or in chamber conference

---

(c) To warrant a finding against the respondent in a contested case, the charge or charges must be established by clear and convincing evidence, and at least two of the members of the Trial Panel must concur in the findings. *State ex rel. Oklahoma Bar Ass'n v. Wolfe*, 1997 OK 47, ¶ 1, 937 P.2d 988; *State ex rel. Oklahoma Bar Ass'n v. Holden*, see note 21, supra.

25. Rule 3.3, Rules of Professional Conduct, 5 O.S.2011 Ch. 1, App. 3–A, see note 2, supra; Rule 8.4 Rules of Professional Conduct, 5 O.S. 2011 Ch 1, App. 3–A, see note 4, supra.

26. Rule 1.3 Rules Governing Disciplinary Proceedings, 5 O.S.2011 Ch. 1, App. 1–A, see note 5, supra.

transcribed. Instead, relying on its notes and everyone's memory, we are asked to suspend a lawyer from her profession based upon what clearly appears to be a misunderstanding or at least does not a appear to be a clear and convincing violation of the rules. In hindsight, Layton should have expressly informed the court that she had "spoken" to Miller briefly, but that she did not conduct any meaningful discussions about his testimony or learn that his testimony would differ from the police report. Her conduct does not rise to a level requiring discipline. The conversation took place within the chaos of the Victim Witness Center. Her actions were taken in the heat of a very contentious and intense trial where she was being verbally attacked by a defense counsel in open court and his staff was disparaging to the alleged victim There is no evidence of active or intentional deceit, nor did the events result in any kind of unfair trial for the defendants, as they were acquitted of the charges. The language she used in explaining what happened was the truth based on actual knowledge of her perception of the trial court's questions.

¶ 29 Even if this conduct rises to the level of a rule violation, the question becomes what form of discipline is appropriate? The Bar Association relies on three comparison cases: *State ex rel. Okla. Bar Ass'n v. Stubblefield*, 1988 OK 141, 766 P.2d 979 (Attorney suspended for 30 days for misrepresentation in adoption and divorce proceedings); *State ex rel. Okla. Bar. Ass'n v. Johnston*, 1993 OK 91, 863 P.2d 1136 (Attorney suspended for commingling and converting funds, making false statements to court, professional incompetence, failure to act promptly and communicate with clients); and *State ex rel. Okla. Bar Ass'n v. Peveto*, 1980 OK 182, 620 P.2d 392 (Attorney suspended for 1 year for neglecting clients' affairs and knowingly making false statements to clients).

¶ 30 Discipline is fashioned to coincide with the discipline imposed upon other lawyers for similar acts of professional misconduct.[27] Although this Court strives to be evenhanded and fair in disciplinary matters, discipline must be decided on a case-by-case basis because each situation involves unique transgressions and mitigating factors.[28] Discipline should be sufficient to persuade the attorney that such conduct will not be tolerated.[29] Mitigating circumstances may be considered in evaluating both the attorney's conduct and assessing the appropriate discipline.[30]

¶ 31 This Court is the sole arbiter of bar discipline.[31] We are free to attribute as much weight to the trial panel's recommendations as we see fit.[32] Most recently, private reprimands have involved: failure to respond to grievances, failure to account for client funds and communicate with clients, selling marital property and concealing it, pleading nolo contendere with pointing a firearm, entering a plea to child abuse by injury. Cases of prior public censure have fallen into categories such as sexual contact or inappropriate sexual advances,[33] dismissals of client's cases, or foil-

**27.** *State ex rel. Oklahoma Bar Ass'n v. Patterson*, 2001 OK 51, ¶ 29, 28 P.3d 551; *State ex rel. Oklahoma Bar Ass'n v. Eakin*, 1995 OK 106, ¶ 0, 914 P.2d 644; *State ex rel. Oklahoma Bar Ass'n v. Bolton*, see note 37, infra at ¶ 16.

**28.** *State ex rel. Oklahoma Bar Ass'n v. Doris*, 1999 OK 94, ¶ 38, 991 P.2d 1015; *State ex rel. Oklahoma Bar Ass'n v. Rozin*, 1991 OK 132, ¶ 10, 824 P.2d 1127.

**29.** *State ex rel. Oklahoma Bar Ass'n v. Miskovsky*, 1997 OK 55, ¶ 15, 938 P.2d 744.

**30.** *State ex rel. Oklahoma Bar Ass'n v. Southern*, 2000 OK 88, ¶ 35, 15 P.3d 1; *State ex rel. Okla-homa Bar Ass'n v. Taylor*, 2000 OK 35, ¶ 33, 4 P.3d 1242.

**31.** *State ex rel. Oklahoma Bar Ass'n v. Rennie*, 1997 OK 108, ¶ 20, 945 P.2d 494; *State ex rel. Oklahoma Bar Ass'n v. Butler*, 1992 OK 150, ¶ 9, 848 P.2d 540.

**32.** *State ex rel. Oklahoma Bar Ass'n v. Rennie*, see note 23, supra; *State ex rel. Oklahoma Bar Ass'n v. Wilkins*, 1995 OK 59, ¶ 12, 898 P.2d 147.

**33.** *State ex rel. Oklahoma Bar Ass'n v. Corrales*, 2012 OK 64, 280 P.3d 968 [Respondent entered an Alford Plea on Count I, of misdemeanor Assault and Batter, based on allegations that he

ing to do anything on a client's behalf[34] or

willfully and unlawfully committed an assault and battery upon his girlfriend. He was sentenced to a one year deferred sentence. He pled nolo contendre on Counts II and III, which were assault upon two different women. Respondent was sentenced to a one-year deferred sentence in each case. The sentences in all three misdemeanors were to run consecutively, resulting in a total of three years,]; *State ex rel. Oklahoma Bar Ass'n v. Murdock*, 2010 OK 32, 236 P.3d 107 [Two counts of Sexual Battery charged in violation of 21 O.S. § 1123(D). One count of Sexual Battery was dismissed and attorney entered an Alford plea on the other count, which was reduced to the misdemeanor of Outraging Public Decency, in violation of 21 O.S. § 22. He was sentenced to one year probation, 50 hours of community service, victim restitution and counseling]; *State ex rel. Oklahoma Bar Ass'n v. Wilburn*, 2006 OK 50, 142 P.3d 420 [The attorney was charged with two felony counts of sexual battery arising from his contact with female security guards at a county courthouse. Eventually, he pled guilty to misdemeanor charges, and he received a one-year suspended sentence as to each count.]; *State ex rel. Oklahoma Bar Ass'n v. Groshon*, 2003 OK 112, 82 P.3d 99 [The record established that the female client hired the attorney to handle her divorce action. Recognizing that she did not have the funds to pay him at that time for his legal services, the attorney agreed to allow her to make payments whenever she was able to do so. However, the attorney did not bill her for services. The lawyer admitted to making numerous suggestive comments to the client and engaging in inappropriate touching of a sexual nature during the course of his representation. At least one of the episodes that took place in the lawyer's office was tape recorded by the client. The client indicated she attempted to find new counsel but was unable to afford their fees.]; *State ex rel. Oklahoma Bar Ass'n v. Foster*, 2000 OK 4, 995 P.2d 1138 [Attorney entered a plea of nolo contendre to the charge of assault with the intent to commit a felony and the imposition of a five-year deferred sentence. The attorney unlawfully, wilfully, and feloniously touched A.M., a. minor child under the age of eighteen (18) years, with the intent to commit the felony of procuring obscene and indecent photographs in violation of 21 O.S. Supp.1996 § 1021.2.]; *State ex rel. Oklahoma Bar Ass'n v. Garrett*, 2005 OK 91, 127 P.3d 600 [The attorney sexually battered two young women by grabbing their breasts and their buttocks while he was intoxicated. The attorney was arrested for felonious sexual battery while intoxicated and pled guilty to misdemeanor battery.]; *State ex. rel. Oklahoma Bar Ass'n v. Copeland*, 1994 OK 21, 870 P.2d 776 [Respondent purposefully touched client's breast and related that sexual favors had been performed for him by another female client.]; *State ex rel. Oklahoma Bar Ass'n v. Sopher*, 1993 OK 55, 852 P.2d 707 [While in the attorney's office, the attorney

other types of client's case mismanage-

touched and looked down the client's blouse. The attorney also did the same thing to the client's mother.].

34. *State ex rel. Oklahoma Bar Ass'n v. Kelley*, 2002 OK 10, 48 P.3d 777 [The first count of the complaint involved the attorney's representation of a client in a workers' compensation case. The complaint asserted that the attorney was not diligent in her representation, the attorney did not keep the client reasonably informed about the matter and foiled to expedite the litigation consistent with the client's interests. The second count against the attorney regarded the OBA's request for the attorney to respond to a grievance filed against her. After numerous requests, the attorney foiled to respond, and a subpoena was issued for her deposition and production of documents.]; *State ex rel. Oklahoma Bar Ass'n v. Minter*, 1998 OK 59, 961 P.2d 208 [Respondent was hired to represent client's son in a first-degree murder case. The son was convicted and sentenced to life in prison without parole. The Respondent filed a notice of intent to appeal with the District Court in Coal County. However, he foiled to also file a designation of record in the district court as required by law. Because the Respondent foiled to file the proper papers to perfect the appeal, OIDS did not accept the case. The client attempted to contact the Respondent numerous times both by telephone and letter regarding the appeal. Respondent did not return any of her calls or respond to any of her letters. After a grievance was filed, the Complainant's office sent three letters to Respondent over the course of several weeks. Respondent did not respond to any of the letters.]; *State ex rel. Oklahoma Bar Ass'n v. Prather*, 1996 OK 87, 925 P.2d 28 [The attorney failed to inform his client that her case had been dismissed on two separate occasions. Also, he did not inform her that he had refiled her case. The client unsuccessfully telephoned the attorney on several occasions to request status reports and information pertaining to her case. The attorney did not return most of her phone calls and he did not inform the client of his change of address after any of his four office moves during the time he represented her.]; *State ex rel. Oklahoma Bar Ass'n v. McManus*, 1993 OK 66, 852 P.2d 727 [The parties agreed that the attorney commingled personal funds with the trust account for client's funds. The attorney foiled to communicate with a client, who filed a grievance against him, and to answer the Bar's letter, requesting that he respond to the grievance. The attorney's foiled to timely pursue a trial for a personal injury case. The attorney's foiled to respond to the Bar's letters regarding the grievance filed by the referring attorney of the injury case.]; *State ex rel. Oklahoma Bar Ass'n v. Angel*, 1993 OK 2, 848 P.2d 549 [The attorney was retained by the clients in a federal action alleging that they were fraudulently induced to accept a change in their

ment.[35] The Bar Association apparently would liken Layton's conduct to that of our

commission arrangement. The attorney engaged in substantial discovery. A motion for summary judgment was filed by defendants in the action and gave the clients 35 days to respond. An extension was granted until The attorney was .unable to formulate a reasonable objection to the motion and requested a second extension. The attorney foiled to file a response by that second extension date, and the trial court granted defendant's motion for summary judgment.]; *State ex rel. Oklahoma Bar Ass'n v. Busch*, 1992 OK 68, 832 P.2d 845 [Respondent foiled to appear and a client's case was subsequently dismissed. Respondent was retained to prosecute a suit arising from an automobile collision and he filed the suit but never caused a summons to be issued. The district court dismissed the case without prejudice because no summons had been issued. The respondent foiled to notify the client that his case had been dismissed. The stipulations also state that the respondent claims that he was never notified of the dismissal and returned the case-file to his client prior to the dismissal The respondent had been previously privately reprimanded the Professional Responsibility Commission for violating the mandatory response provisions of Rule 5.2 and the Bar included this Count to enhance discipline.]; *State ex rel. Oklahoma Bar Ass'n v. Donnelly*, 1992 OK 164, 848 P.2d 543 [The attorney Med to initiate a collection action on his clients' behalf despite his representations to the clients that he had in fact done so.]; *State ex rel. Oklahoma Bar Ass'n v. Braswell*, 1983 OK 63, 663 P.2d 1228 [The attorney foiled to file a tort claim on behalf of a client within the limitations period. It was immaterial whether the attorney had assigned the matter to a law clerk or had simply misplaced the case. His procedures for monitoring unfiled cases were clearly inadequate.].

35. *State ex rel. Oklahoma Bar Ass'n v. Townsend*, 2012 OK 44, 277 P.3d 1269 [The attorney missed court dates resulting in rulings adverse to clients, failed to communicate, lacked diligence, and did not return files to clients in a timely manner.]; *State ex rel. Oklahoma Bar Ass'n v. Martin*, 2010 OK 66, 240 P.3d 690 [Respondent's utter failure to supervise any of a non-attorney's work activities enabling him to engage in the unauthorized practice of law by performing legal services without proper supervision by a licensed lawyer. Also, respondent was vicariously liable in disciplinary responsibility for all the misdeeds of his unlicensed employee which went unnoticed until the victim complained.]; *State ex rel. Oklahoma Bar Ass'n v. Funk*, 2005 OK 26, 114 P.3d 427 [Respondent allowed the client trust account to fell below the amount held on behalf of the client. The court found that the attorney had no intent to commingle funds but he had mismanaged the client account.]; *State ex rel. Oklahoma Bar Ass'n v. Taylor*, 2003 OK 56, 71 P.3d 18 [Respondent knowing one or more of his client's

medical providers were claiming interest in the settlement proceeds he received, and not knowing Texas law as to exactly what their interest was or exactly how to distribute the proceeds appropriately under the law, the attorney disbursed much of the proceeds to himself He then embarked on a course of potentially indefinite delay with regard to the remaining proceeds, even though he knew either one or more of the providers or his client was entitled to the bulk of the funds he retained.]; *State ex rel. Oklahoma Bar Ass'n v. Erickson*, 2001 OK 66, 29 P.3d 550 [Attorney violated rule providing that it is professional misconduct to state or imply ability to improperly influence government agency or official and rule providing that it is professional misconduct to violate or attempt to violate professional conduct rules, to knowingly assist or induce another to do so, or to do so through acts of another.]; *State ex rel. Oklahoma Bar Ass'n v. Simank*, 2001 OK 13, 19 P.3d 860 [The undisputed facts were that respondent persistently failed to respond to 10 letters from the bar requesting information and also failed to sign for an additional 5 certified letter that were mailed to his official bar address.]; *State ex rel. Oklahoma Bar Ass'n v. Brewer*, 1999 OK 101, 998 P.2d 605 [Respondent failed to keep his clients reasonably informed of the status of their cases, failed to respond to their reasonable requests for information, and failed to make reasonable efforts to expedite litigation. The court also found the evidence supported a finding that respondent failed to answer complainant's request for information regarding the grievances filed against him.]; *State ex rel. Oklahoma Bar Ass'n v. Bills*, 1997 OK 151, 951 P.2d 1090 [The attorney was representing a wife in a divorce proceeding and accepted a retainer against which he could charge his fees as they were earned. The client discharged the attorney and requested the return of the unused portion of the retainer and an accounting. The attorney had not kept an account of the hours he had spent on the file and had to recreate it from memory.]; *State ex rel. Oklahoma Bar Ass'n v. Blackburn*, 1991 OK 35, 812 P.2d 379 [Two counts were filed against respond. 1) Because of his substance-abuse problems, the attorney neglected to file a brief on behalf of his client in a criminal appeal 2) A wife contacted Blackburn by telephone and recruited him to handle her divorce. In this conversation, she revealed a number of factors about her finances, requests for alimony and child support, and custody considerations. Later Blackburn wrote to wife stating that he had been contacted by her husband and was filing suit for divorce on the husband's behalf Blackburn had evidently been a family friend of the husband for a number of years.]; *State ex rel. Oklahoma Bar Ass'n v. Borders*, 1989 OK 101, 777 P.2d 929 [Attorney failed to communicate with criminal defendant's mother and with public defender's office and failed to preserve property of client and to act

recent prosecutorial case of *State ex rel. Okla. Bar Ass'n v. Miller*, 2013 OK 49, 309 P.3d 108, wherein Miller was charged with 5 counts of misconduct during a murder trial and suspended for 180 days.

¶ 32 If we were to fashion discipline here to coincide with the discipline imposed upon other lawyers for similar acts of professional misconduct, even while considering the unique transgressions and mitigating factors in this cause, it appears that the case should be dismissed, much like that in *State ex rel. Okla. Bar Ass'n v. Krug*, 2004 OK 28, ¶ 12, 92 P.3d 67 and *State ex rel. Okla. Bar Ass'n v. Roberts*, SCBD 5468 (A disciplinary proceeding we dismissed wherein the lawyer was charged with the duty to inform a probate court of a "possible" existence of a will). Accordingly, the bar disciplinary proceeding is dismissed, the respondent is exonerated of the charges, and the application to assess costs is denied.

## CONCLUSION

¶ 33 We do not reach this conclusion lightly. However, our responsibility is not to punish but to inquire into and gauge a lawyer's continued fitness to practice law, with a view to safeguarding the interest of the public, of the courts, and of the legal profession. Discipline is imposed to maintain these goals rather than as punishment for the lawyer's misconduct.[36] Disciplinary action is also administered to deter the attorney from similar future conduct and to act as a restraining vehicle on others who might consider committing similar acts.[37] It is fashioned to coincide with the discipline imposed upon other lawyers for similar acts of professional misconduct.[38]

¶ 34 This entire proceeding does not reflect well on the administration of justice. No one is without fault:

1) the respondent misunderstood and failed to tell the truth with precision;

2) the judge presided over and allowed without sanctions, inappropriate conduct by Loftis. The admitted hostility between Lofits and the assistant district attorney and her employer tainted the sanctity of the courtroom. Failure to have a written record of the bench and in camera conferences exacerbated the problem. Tempers were permitted to flow where cold neutrality is the standard; and

3) the disciplinary proceeding by the Bar Association focused only on the allegations against the respondent and completely ignored the totality of the circumstances.

Were this an athletic contest, all of the players would have been ejected for unsportsmanlike conduct. The respondent explained her mistake. Based on the record and the lack thereof, the others are inexplicable.

¶ 35 Under the facts presented, the respondent's violation of the rules does not warrant discipline. Imposing discipline for such a violation would not serve any of the purpose of which discipline is administered. Consequently, the bar disciplinary proceeding should be dismissed and the respondent exonerated of the charges. The Bar Association's application to assess costs is denied.

---

36. *State ex rel. Oklahoma Bar Ass'n v. Smith*, 1980 OK 126, ¶ 21, 615 P.2d 1014; *State ex rel. Oklahoma Bar Ass'n v. Lowe*, 1982 OK 20, ¶ 19, 640 P.2d 1361.

diligently to represent client's interests.]; *State ex rel. Oklahoma Bar Ass'n v. McNaughton*, 1986 OK 25, 719 P.2d 1279 [The attorney, who had accepted representation of an adult defendant charged with the felony offense of lewd molestation of a minor, also served as counsel in prosecution related matters, for the alleged underage victim of the crime, her minor sister, and their adult mother. The attorney argued that he had made a full disclosure to the mother.].

37. *State ex rel. Oklahoma Bar Ass'n v. Bolton*, 1995 OK 98, ¶ 12, 904 P.2d 597; *State ex rel. Oklahoma Bar Association v. Donnelly*, 1992 OK 164, ¶ 11, 848 P.2d 543; *State ex rel. Oklahoma Bar Ass'n v. Hall*, 1977 OK 117, ¶ 12, 567 P.2d 975.

38. *State ex rel. Oklahoma Bar Ass'n v. Patterson*, 2001 OK 51, ¶ 29, 28 P.3d 551; *State ex rel. Oklahoma Bar Ass'n v. Eakin*, 1995 OK 106, ¶ 0, 914 P.2d 644; *State ex rel. Oklahoma Bar Ass'n v. Bolton*, see note 37 at ¶ 16, supra.

BAR DISCIPLINARY PROCEEDINGS DISMISSED; RESPONDENT EXONERATED; APPLICATION FOR COSTS DENIED.

COLBERT, C.J., REIF, V.C.J., KAUGER, WINCHESTER, EDMONDSON, TAYLOR, COMBS, GURICH, JJ., concur.

WATT, J., dissents.

WATT, J., dissenting.

¶1 The majority attempts to make Layton's lack of candor with the court everyone's fault except that of the respondent, the one and only individual who had control over what came out of her mouth. Furthermore, it imposes upon the trial court an unwarranted measure of blame.

¶2 At all times concerning the charges of misconduct respondent, an assistant district attorney, was not only an officer of the court but was the representative and the face of the Sovereign State of Oklahoma in prosecuting this case. According to Layton's profile, she served in this position for some eight (8) years. It is difficult to believe that, as an experienced prosecuting attorney, the chaos in the courthouse the day she encountered her witness was much different than any contested criminal proceeding in which she had participated. It is common knowledge that our County Courthouses are, for the most part, completely inadequate and provide little opportunity for "quiet conversations" with anyone. Most often, attorneys are forced to conduct such interviews in hushed tones and in crowded hallways filled with other parties and their attorneys attempting to do the same.

¶3 When directly asked by the trial judge if she had spoken to her witness, Antral Miller, prior to trial, she lied to the court in answering his question—"NO."!

¶4 In response to the charges brought against the respondent, she wants this court to believe that she was confused by the trial court's question; that she did not intend to mislead the court; and that her answer produced no harm and, therefore, no foul.

¶5 The record reflects that respondent had at least two other opportunities to proffer the correct and truthful answer (that she had, in fact, talked to Mr. Miller). Once during Mr. Miller's testimony at trial, and also during a meeting in the judge's chambers with and in the presence of the judge and opposing counsel Yet, respondent continued to perpetuate her original lie to the court.

¶6 I agree that there was no excuse for some of the actions of the opposing counsel in this cause. Nevertheless, I cannot condone the majority's shifting any modicum of the blame for error onto the trial court bench. The Oklahoma Court of Criminal Appeals has made it clear that in serious criminal cases, the "better practice" is to transcribe all proceedings, both those in chambers and at the bench Nevertheless, the failure to do so is not considered "fundamental error" by the Criminal Court especially where, as here, the criminal defendants were acquitted.[1] Furthermore, in cases on review before that honorable tribunal, it is expected that defense counsel will protect the rights of their clients by objecting to off-the-record proceedings.[2] The objection was not proffered in this cause, leaving the trial court without the opportunity to rule on the same.

¶7 As a former prosecutor, criminal defense lawyer, and trial court judge, it has been and is my continuing opinion that the one unforgivable sin of any attorney/officer of the court is—"TO LIE TO THE COURT.".

¶8 The majority acknowledges that '[t]he record is clear that Layton was not clearly candid to the trial court that she spoke with Miller before his testimony, or what was discussed.' Nevertheless, it adopts the respondent's sugarcoated version of this trans-

1. See, *Childress v. State of Oklahoma*, 2000 OK CR 10, ¶33, 1 P.3d 1006.

2. See, *Wackerly v. State of Oklahoma*, 2000 OK CR 15, ¶8, 12 P.3d 1.

gression and the majority opinion signs off by dismissing the charges against her. Accordingly, I would impose costs against this respondent and further impose a lengthy period of suspension based upon the facts before us and for that reason I respectfully dissent.